**POLK BROS., INC., Plaintiff,**

v.

**CHICAGO TRUCK DRIVERS, HELPERS, AND WAREHOUSE WORKERS UNION (INDEPENDENT), Defendant.**

**No. 88 C 4030.**

United States District Court,
N.D. Illinois, E.D.

Nov. 28, 1990.

---

Elaine S. Fox, Robert A. Kohn, Gottlieb and Schwartz, Marc R. Jacobs, D'Ancona & Pflaum, Chicago, Ill., for plaintiff.

Paul L. Glover, Chicago, Ill., for defendant.

## ORDER

NORGLE, District Judge.

Before the court are the cross-motions for summary judgment of plaintiff Polk Bros., Inc. ("Polk Bros.") and defendant Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) ("Union").[1] For the reasons set forth below, Polk Bros.' motion is granted in part and denied in part, and the Union's motion is granted in part and denied in part.

---

1. The court notes that the Union has not actually filed a motion for summary judgment. It has, however, filed a pleading styled: "... Memorandum in Support of Its Motion for Summary Judgment and In Response to Plaintiff Polk Bros., Inc.'s Motion for Summary Judgment" ("Union Memorandum"). Because the parties have fully briefed the issues, the court will treat Union's submission as incorporating a properly filed motion.

## FACTS

Polk Bros. filed this action pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, to set aside and vacate a portion of an arbitrator's award rendered pursuant to arbitration between Polk Bros. and the Union under three collective bargaining agreements. The three agreements covered 102 drivers and helpers ("Drivers Agreement"), 54 warehouse workers ("Warehouse Agreement"), and 7 furniture refinishers ("Refinishers Agreement") (collectively, "Agreements"). Between June 2 and August 20, 1987, Polk Bros. permanently laid off all 163 employees covered by these three Agreements due to circumstances caused by a devastating fire at Polk Bros.' warehouse and distribution facility. The following background sets the context in which these layoffs were made.[2]

Polk Bros. is in the business of merchandising and retailing home furnishings including appliances, carpeting, furniture, housewares and electronics. It has grown from a single retail outlet in the 1930's to ten retail stores serving the greater Chicago metropolitan area. Since the 1950's, Polk Bros. had consolidated all phases of its corporate, warehousing and home delivery operations at a single location known as the Melrose Park distribution center. This center contained 400,000 square feet of building space on 22 acres and had housed, among other things: a retail store; a 275,000 square foot warehouse and distribution center which contained virtually all of the company's inventory for furniture, carpeting, and appliances; 40 delivery trucks, 6 tractor trailer units, 22 loading docks for the main warehouse, 2 loading docks for the carpet area, and a railroad siding; a garage equipped with a gas pump and underground tank to service the trucks; and general offices housing many of the company's corporate departments, such as accounting, payroll, and personnel.

The distribution center was conveniently located for easy access to the city and suburbs and permitted the company to deliver merchandise to any location within 75 miles of Chicago. Its efficient, around the clock operations enabled Polk Bros. to develop its reputation for speedy home delivery. In many instances, Polk Bros. was able to promise customers delivery within 24 hours of purchase.

On June 1, 1987, the Melrose Park distribution center was completely destroyed by fire. Virtually all operations consolidated at the distribution center were demolished. Without a warehouse to receive and store inventory, the plaintiff's ability to fill sales orders was critically impaired and Polk Bros. faced failure. The company's management was under considerable pressure to resolve the problems of receiving and delivering merchandise and to keep the company in business.

Immediately following the fire, Polk Bros. implemented three interim methods of delivering merchandise: direct store sales, drop shipments by vendor, and drop shipments by third party carrier. None of these measures proved successful. The direct store sales method consisted of selling display merchandise from the sales floor of the company's ten retail outlets. Company drivers with company trucks were assigned to individual retail stores and deliveries were made from the stores to broad geographic areas. This method proved inefficient and time consuming. Further, the company was unable to replace merchandise sold off the showroom floor on a daily basis. The drop shipment method consisted of delivering merchandise to the customer directly from the local manufacturer or supplier. These deliveries were either made by the vendor or by third party deliv-

---

**2.** Although the parties apparently agree that all relevant facts before the court are undisputed, neither party has made any effort whatsoever to follow General Rule 12 of the Local Rules for the Northern District of Illinois. The parties' disregard for Rule 12 constitutes grounds for denial of their motions, Local Rule 12(m); *Bell, Boyd & Lloyd v. Tapy,* 896 F.2d 1101, 1103 (7th Cir.1990). However, this court has the discretion not to enforce this rule to the hilt. *Tapy,* 896 F.2d at 1103; *see Aetna Casualty & Surety Co. v. Spancrete of Illinois, Inc.,* 726 F.Supp. 204, 206 (N.D.Ill.1989). The court declines to elevate form over substance by denying both parties' motions on procedural grounds alone.

ery outfits.[3] The drop shipment method was also expensive and inefficient. Further, most of the company's suppliers of major appliances had no local facilities for warehousing and home delivery. The ineffectiveness of the interim measures was reflected in the high rate of sales order cancellations, which, shortly after the fire, approached 60%.

The company also implemented separate interim delivery methods for carpet sales. After the fire, it ceased using carpeting cut from its own inventory, and instead used outside suppliers. Polk Bros.' carpet installers had to travel to three separate warehouses to pick up carpet, padding and accessories, and then proceed to the customers' location for installation. This procedure was highly inefficient and costly. By June 19, 1987, Polk Bros.' carpeting sales dropped by 75%.

As it implemented these various interim measures, Polk Bros. considered three long term solutions to its warehouse and delivery problems. First, it considered rebuilding, but soon rejected that idea based on architects' estimates that it would take more than a year just to rebuild the site, after drafting plans, removing debris, and obtaining all the necessary approvals and permits. Second, it considered purchasing or leasing an alternate facility. It examined 18 to 20 facilities, but found none that met all of its requirements. The two sites that met most of its requirements had other serious problems which the management considered unacceptable. Finally, Polk Bros. considered contracting with third party carriers to provide warehousing and home delivery.

On June 19, 1987 Polk Bros. entered into a letter of understanding with Merchants Home Delivery Service, Inc. ("Merchants") to provide warehousing and home delivery for its carpet division. Merchants is a non-union employer offering warehousing and home delivery services nationally. It typically operates with a combination of its own employees, to perform the warehousing function, and independent drivers set up as owner-operators to provide home delivery.

In early July, Polk Bros. began negotiating with Merchants for the balance of the company's warehouse and distribution operations. Plaintiff claims that its desperate situation and lack of suitable alternatives placed it at a serious bargaining disadvantage with Merchants. On July 30, 1987, Merchants and Polk Bros. executed a Distribution Services Agreement which gave Merchants the exclusive right to run Polk Bros.' warehousing and distribution operations for a period of five years. Plaintiff claims that due to Merchants' superior bargaining position, it was forced to acquiesce to conditions—such as the five year contract term—which it otherwise would have rejected. The Distribution Services Agreement transferred to Merchants many of the operations which had previously been performed in-house by Polk Bros.' union workers.

On August 12, 1987, Polk Bros. entered into an agreement with another company, Crosstown Home Deliveries, Inc., to provide home delivery of General Electric appliances in those situations where Merchants encountered problems with warehousing the appliances in bulk. By August 20, 1987 Polk Bros., which had begun laying off drivers, helpers, warehouse workers and furniture refinishers shortly after the fire, terminated its remaining workers and ceased all home delivery operations.

Soon after the layoffs, the Union filed grievances with Polk Bros., claiming that the decision to contract with Merchants for warehousing and delivery services violated the terms of the Drivers, Warehouse, and Refinishers Collective Bargaining Agreements. Pursuant to the Agreements, the contract disputes went into arbitration.

In November 1987, the parties participated in a hearing before a mutually selected arbitrator, Harvey Nathan. On December 4, 1987, shortly after the arbitration hearing, the Union requested negotiations

---

**3.** One such delivery company with which Polk Bros. contracted was Sullivan's Home Delivery Service, Inc. Both before and after the fire, Polk Bros. used Sullivan's for cross-docking and home delivery of special order merchandise which it did not customarily stock.

with Polk Bros. for successor agreements to the collective bargaining contracts. On January 11, 1988, Polk Bros. notified the Union that it would not negotiate or enter into any successor agreements to the three collective bargaining agreements which were scheduled to terminate, by their own terms, on March 31, 1988.

The parties submitted post-hearing briefs to the arbitrator in January of 1988. On April 15, 1988, Arbitrator Nathan issued his award. In this award, the arbitrator held that:

1) Polk Bros.' contracts with Merchants and Crosstown Deliveries violated the "transfer of operations" (Article I) and "subcontracting" (Article 13) clauses of the Drivers Agreement and the "successor" clause (Article XIX, sec. 2) of the Refinishers Agreement.

2) Polk Bros. violated its implied obligation of good faith and fair dealing under the Warehouse Agreement by subcontracting its carpet warehousing operations to Merchants. In all other respects, Polk Bros. did not violate the Warehouse Agreement.

3) Polk Bros. must reinstate all drivers, helpers and furniture refinishers who were in its employ on June 1, 1987, and the same number of warehousemen employed in its carpet operations as of June 1, 1987.

4) Polk Bros. must make these employees whole for all wages and other benefits lost as of June 19, 1987 for the warehouse employees and July 30, 1987 for the truck drivers and helpers and the furniture refinishers.

On May 6, 1988, Polk Bros. filed this suit to set aside two portions of the arbitrator's award. First, it challenges the remedy portion of the award which grants reinstatement to all drivers, helpers, and furniture refinishers who were employed by Polk Bros. on June 1, 1987 and extends back pay to these workers beyond March 31, 1988. Second, Polk Bros. challenges the liability portion of Arbitrator Nathan's decision which holds that it violated the Warehouse Agreement by contracting with Merchant's for its operation of a carpet facility.[4]

In September of 1988, the parties filed cross motions for summary judgment. In its motion, Polk Bros. argues that because the Agreements expired by their own express terms on March 31, 1988, the arbitrator exceeded his authority in awarding reinstatement and back pay beyond this date. It also argues that arbitrator Nathan acted outside his authority by reading an implied covenant of good faith into the Warehouse Agreement. Polk Bros. notes that each collective bargaining agreement specifically limits the arbitrator's power to act outside the express terms of the agreement.[5] The Union responds that the arbitrator's award must stand because it draws its essence from the collective bargaining agreements and because the arbitrator correctly held that the terms of the agreements extend beyond the March 31, 1988 expiration date by operation of law.

## DISCUSSION

As a general rule, courts should refrain from reviewing the merits of an arbitration award under a collective bargaining agreement. *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). Arbitrators are generally in a

---

**4.** Polk Bros. does not challenge the arbitrator's finding that it violated the Drivers Agreement and the Refinishers Agreement. It also does not challenge the award of back pay through March 31, 1988, for the drivers, helpers, and furniture refinishers.

**5.** The Drivers Agreement and the Warehouse Agreement contain the identical limiting language:

The arbitrator shall have no power to add to, subtract from, modify or amend any provision of this Agreement, change existing wage rates, or arbitrate proposals for the amendment or renewal of this Agreement, unless otherwise agreed.

The Refinishers Agreement states:

The arbitrator shall have no power to determine arbitrarily nor add to, subtract from, modify or amend any provision of this Agreement, nor to substitute his discretion for the discretion of the UNION or the EMPLOYER, change existing wage rates, or arbitrate proposals for the amendment or renewal of this Agreement.

unique position to settle disputes which "require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as reflected in particular agreements." *Id.* The federal policy of settling labor disputes by arbitration would be undermined if the courts substituted their judgment for the judgment of the arbitrator. *See* 363 U.S. at 596, 599, 80 S.Ct. at 1360, 1362. Nevertheless, a federal court is not entirely without discretion to review an arbitrator's award.

> [A]n arbitrator is confined to the interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

363 U.S. at 597, 80 S.Ct. at 1361.

▮ As more recent cases have pointed out, it often is unclear whether an arbitration award is "draws its essence from the collective bargaining agreement" or is supported only by the arbitrator's private notion of equity. *See, e.g., Ethyl Corp. v. United Steelworkers of America,* 768 F.2d 180, 185 (7th Cir.1985). If the award is based upon an arbitrator's misreading of the contract, the court nevertheless must uphold the award so long as the arbitrator's interpretation—unsound though it may be—is derived from the language of the contract. *Ethyl,* 768 F.2d at 184. Any reasonable doubt about whether an arbitrator's award draws its essence from the collective bargaining agreement must be resolved in favor of enforcing the award. 768 F.2d at 185, 187.

### 1. *Reinstatement and Back Pay Beyond March 31, 1988*

▮ In the present case, it is difficult for the court to ascertain the basis of Arbitrator Nathan's decision to award reinstatement and back pay beyond the expiration dates of the relevant agreements. In the opinion accompanying the award ("Award Opinion"), the arbitrator does not specifically state the grounds supporting this aspect of the award. The only language in the 72 page Award Opinion relevant to this point is found on page 62:

> I will not dictate the manner in which the Company may choose to work itself out of its dilemma. Alternatively, it may as a legal and/or practical matter need to negotiate certain specifics with the Union. *Indeed, inasmuch as all collective bargaining agreements at issue in this case have now expired, and continued terms and conditions of employment exist by operation of law,* negotiations will be required in any event. By simply awarding reinstatement and a make whole remedy, I hope to provide the parties with sufficient latitude to work out the exigencies. [Emphasis added.]
>
> Nonetheless, I want it to be abundantly clear that the availability of negotiations is not intended to diminish the rights of the specific employees covered by this Award to be made whole on a continuing basis until an agreement is reached for the future or until the Company is under no further obligation to bargain as a matter of law.

It is not clear from this language whether the arbitrator's decision to award reinstatement and back pay beyond the expiration date of the agreements is based solely upon his view of the requirements of extracontractual law or upon his construction of the agreement as supplemented by applicable law.

If the award was based solely upon extracontractual law, it cannot stand. *Roadmaster Corp v. Production and Maintenance Employees' local 504,* 851 F.2d 886 (7th Cir.1988). In *Roadmaster,* the employer ("Roadmaster") sent timely notice to the union ("Local 504"), that it intended to terminate the collective bargaining agreement between the parties as of February 28, 1986. This notice complied with the "Duration" provision of that agreement which provided that the agreement would terminate on February 28, 1986, and would automatically renew from year to year un-

less one party served the other with sixty day notice of its desire to modify or terminate the contract. After serving notice, Roadmaster refused to negotiate with Local 504. The union then obtained a district court order compelling Roadmaster to arbitrate numerous issues. The arbitrator held that Roadmaster's notice was void because Roadmaster violated Section 8(d)(2) of the National Labor Relations Act by refusing to bargain with the union. The arbitrator concluded that the "rollover" provision of the agreement renewed its terms for another year. Roadmaster filed suit in district court and had the arbitration award vacated on summary judgment. The Seventh Circuit affirmed, stating that the arbitrator:

> based his decision not upon the parties' bargain, but rather upon his "view of enacted legislation." Thus he has " 'exceeded the scope of the submission' and the award will not be enforced." [Citation omitted.]

. . . . .

The arbitrator clearly went beyond considering the contract's terms to consider outside "positive" law, the NLRA. Resolution of NLRA disputes must be left to the NLRB and not to an arbitrator. When a contract, such as the one involved here, specifically limits an arbitrator's subject matter jurisdiction, the arbitrator should restrict his consideration to the contract, even if such a decision conflicts with federal statutory law.

*Roadmaster,* 851 F.2d at 889.

Here, as in *Roadmaster,* the arbitrator appears to have based his award not upon the parties' bargain, but rather upon his view of "the operation of law" outside the Agreements. Arbitrator Nathan clearly held that "all the collective bargaining agreements at issue in this case have now expired," and he does not point to any language in the Agreements which expressly or impliedly extends the Union's contractual rights beyond this expiration. On the contrary, the statement that the "continued terms and conditions of employment exist by operation of law," suggests that this portion of the award was based upon "positive" law rather than upon the Agreements.

The court notes that where it is unclear whether the arbitrator based his award solely upon "positive" law, or upon some interpretation of the agreement, this ambiguity alone is insufficient to overturn the award. In the *Enterprise Wheel* case, the Supreme Court, faced with a similar issue, stated:

> The opinion of the arbitrator in this case, as it bears upon the award of back pay beyond the date of the agreement's expiration and reinstatement, is ambiguous. It may be read as based solely upon the arbitrator's view of the requirements of enacted legislation, which would mean that he exceeded the scope of the submission. Or it may be read as embodying a construction of the agreement itself, perhaps with the arbitrator looking to "the law" for help in determining the sense of the agreement. A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions.

*Enterprise Wheel,* 363 U.S. at 597–598, 80 S.Ct. at 1361. In *Enterprise Wheel,* the Court concluded that it had "no reason to assume that this arbitrator ... has not stayed within the areas marked out for his consideration. It is not apparent that he went beyond the submission." 363 U.S. at 598, 80 S.Ct. at 1361. The Court also noted that the Court of Appeals opinion affirming the district court's refusal to enforce the award was not based upon a finding that the arbitrator exceeded his authority, but was based upon its disagreement with the arbitrator's construction of the agreement. *Id.*

In the present case, unlike *Enterprise Wheel,* it appears clear that the arbitrator did not act within the areas marked out for his consideration, but instead relied on law outside the Agreements. The Agreements

all expressly prohibit the arbitrator from adding to, subtracting from, modifying or amending any portion of the contracts. *See* footnote 5, above. By awarding reinstatement and back pay beyond the March 31, 1988 termination date of the Agreements, Arbitrator Nathan effectively amended the "Contract Term" provision of the Agreements, pursuant to which Polk Bros. properly notified the Union of its intention not to renew the Agreements beyond their natural expiration date.[6] The arbitrator's reliance on "positive" law exceeded the authority vested in him by the express agreement of the parties.

In holding that the arbitrator's award of reinstatement and back pay beyond March 31, 1988 fails to draw its essence from the Agreements at issue, the court is aware that the arbitrator is empowered to base his award on reasonable implied terms as well as express terms of the contract. *Ethyl Corp.*, 768 F.2d at 186.

> [C]ontracts have implied as well as express terms, and the authority of an arbitrator to interpret a collective bargaining contract includes the power to discover such terms. [Citation omitted.] Indeed, "as long as a plausible solution is available within the general framework of the agreement, the arbitrator has the authority to decide what the parties would have agreed on had they foreseen the particular item in dispute.... In such cases, judicial review is limited to whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement." [Citation omitted.]

Inferring an implied condition must be distinguished from creating one, tenuous as the distinction may be as a practical matter. The arbitrator may not modify the contract unless authorized to do so. 768 F.2d at 186. Under the *Ethyl Corp.* reasoning, if a court can find any reason-

able basis in the agreement for the arbitrator's award, the court must presume that the arbitrator was acting on this basis. The court may only find that the arbitrator exceeded his authority if there is no reasonable or rational basis for the award within the four corners of the agreement. *See Ethyl Corp.*, 768 F.2d at 184–185 ("It is only when the arbitrator *must* have based his award on some body of thought or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference, either, [citation omitted]) that the award can be said not to 'draw its essence from the collective bargaining agreement' ..." [emphasis in original]).

In its Memorandum in Support of Its Motion for Summary Judgment and In Response to Plaintiff Polk Bros., Inc.'s Motion for Summary Judgment ("Union Memorandum"), the Union argues that the reinstatement and back pay portion of the arbitrator's award is supported by the "Contract Term" provisions of the Agreements (Article 30 of the Drivers Agreement, Article 27 of the Warehouse Agreement, and Article XX of the Refinishers Agreement).[7] These provisions state, in relevant part:

> This Agreement shall be in full force and effect from April 1, 1986 to and including March 31, 1988. If either party wishes to modify this Agreement at its expiration, it shall serve notice in writing of such request upon the other party not less than 60 days prior to the expiration date. In the absence of the service of such notice, this Agreement shall automatically renew itself for a period of one year and from year to year thereafter.

Article 30, Drivers Agreement; Article 27, Warehouse Agreement.

> Section 1. It is further agreed that this Agreement shall be effective as of the 1st day of April, 1984, and shall thereafter continue in full force and effect for

---

6. In this sense, Arbitrator Nathan's award is similar to the arbitrator's award in *Roadmaster*, where the arbitrator voided the employer's notice of termination and held that the contract was renewed for another year.

7. The Union also argues that "Established Labor Law Allows the Continuation of the Terms of

the Collective Bargaining Agreements Pending Resolution of the Impasse." Union Memorandum, p. 7. As discussed above, however, the relevant inquiry is not whether the arbitrator's decision may be supported by "established labor law," but whether the award is grounded within the four corners of the Agreements.

three (3) years, until and including the 31st day of March, 1987. On or before sixty (60) days prior to the expiration hereof, either party may notify the other in writing of a desire to negotiate for the renewal of this Agreement, either in its present form, or with such changes of modifications as may be desired. Upon such notification, the Parties hereto shall immediately confer for the purpose of such negotiations. In the event that written notice is not delivered by either party as provided above, then in that event, this Agreement shall be automatically renewed for an additional period of one (1) year from the date of the expiration thereof, or of any extension thereof, and in like manner annually, *unless notice of termination is given.* [Emphasis added.]

This Agreement shall continue in full force and effect during periods when the Agreement is being negotiated.

Article XX, Refinishers Agreement.

The Union argues that these provisions establish the affirmative obligation of Polk Bros. to negotiate with it "concerning the modification of these Collective Bargaining Agreements at their expiration." Union Memorandum, p. 6. It appears to take the position that Polk Bros. has no right to terminate the Agreements, but only a right to modify them. The logical extension of this position is that the Union's contractual rights continue in perpetuity, subject only to modification by negotiation or arbitration.

The Union's attempt to find some contractual justification for the reinstatement and back pay portion of the award is unpersuasive. Although Article XX of the Refinishers Agreement contains language requiring the parties to negotiate, it also expressly provides for termination of the Agreement upon timely notice. Polk Bros.' January 11, 1988 notice of termination was timely and the arbitrator did not find it ineffective.

Unlike the Refinishers Agreement, the Drivers Agreement and the Warehouse Agreement do not explicitly require the parties to negotiate when one party serves the other with timely notice of its request to modify the Agreement. Although these latter two Agreements do not expressly set forth conditions for termination, they each contain a built-in expiration date. The arbitrator expressly found that these Agreements had in fact expired, Award Opinion, p. 62, and he did not find that they had automatically renewed. Having determined that the three Agreements had terminated, the arbitrator nevertheless extended the terms of these defunct Agreements by "operation of law." This holding could not have been based upon the language or spirit of the Agreements which unquestionably had expired.

The court finds that Arbitrator Nathan's award of reinstatement and back pay beyond March 31, 1988, finds no reasonable basis whatsoever within the four corners of the agreement. This portion of the award must have been based upon "some body of thought or feeling, or policy, or law that is outside the contract" and it cannot be enforced. The court, therefore, vacates this portion of the arbitrator's award.

### 2. *Implied Covenant of Good Faith in the Warehouse Agreement*

 The court now turns to the second issue raised by Polk Bros.: whether the arbitrator exceeded his authority by finding an implied covenant of good faith and fair dealing in the Warehouse Agreement.[8] Arbitrator Nathan's finding that Polk Bros. violated the Warehouse Agreement by contracting with Merchant's for its operation of a carpet facility is based upon his finding that the Warehouse Agreement contains an implied covenant of good faith and fair dealing. Award Opinion, pp. 39, 40, 58–60. As discussed above, arbitrators may base their awards upon the reasonable implied terms, as well as the express terms, of a collective bargaining agree-

---

**8.** The court notes that the parties' briefs on the second challenged portion of the arbitration award are comparatively sparse. Polk Bros. devotes less than one and a half pages of its thirty seven page initial memorandum to this issue. The Union, in turn, devotes exactly two sentences of its memorandum in response to Polk Bros.' arguments on this issue.

ment. *Ethyl Corp.*, 768 F.2d at 186. Where an arbitrator's award relies on such implied terms, judicial review is limited to whether the arbitrator's solution can rationally be derived from some plausible theory of the general framework or intent of the agreement. *Id.* Nothing in the language of the Warehouse Agreement indicates that the parties would not have agreed upon a mutual obligation of good faith and fair dealing in carrying out that Agreement's terms. On the contrary, a simple reading of the Agreements reveals a general intent by both parties to deal with each other fairly and in good faith. Therefore, the court holds that the arbitrator's application of an implied covenant of good faith in that Agreement was not outside his authority.

In so holding, the court declines to rule on the soundness of Arbitrator Nathan's application of the implied covenant of good faith to the facts at issue. The court notes that Warehouse Agreement, unlike the other two collective bargaining agreements before the arbitrator, did not contain a work preservation clause which restricted Polk Bros.' right to subcontract unit work. In fact, the arbitrator himself addressed this point specifically, stating:

> Initially, I find that the Union's failure to secure an express work preservation clause in its contract with Polk covering warehousemen is particularly significant when viewed against the other bargaining agreements at issue in this case.... The Union's failure to secure a similar provision for a unit represented by it for some 30 years at the same employer location is strong indication of the CTDU's acquiescence that such right is reserved to the Company under its management rights clause.

Award Opinion, pp. 56–57. After finding "strong indication" that Polk Bros. "reserved" the right to subcontract work under the Warehouse Agreement, the arbitrator nevertheless found that Polk Bros.' subcontracting of its carpet warehousing to Merchants violated its implied obligation of good faith in the Warehouse Agreement. These two findings appear to be inherently inconsistent.

However, regardless of the wisdom of this portion of the Award Opinion, the court may not substitute its judgment for the judgment of the arbitrator. Having found that the arbitrator was within his authority in finding an implied obligation of good faith in the Warehouse Agreement, the court necessarily must find that the arbitrator's application of this implied term in the award draws its essence from the collective bargaining agreement.

## CONCLUSION

For the reasons discussed above, the court grants summary judgment in favor of Polk Bros. on the issue of reinstatement and back pay beyond March 31, 1988. The court therefore vacates that portion of the arbitration award which grants reinstatement and back pay beyond March 31, 1988 for employees covered by the Drivers, Warehouse, and Refinishers Agreements. This order does not affect any award of back pay for any of the covered employees for the period on or before March 31, 1988. The court grants summary judgment in favor of the Union on the issue of whether Polk Bros. violated the terms of the Warehouse Agreement by subcontracting its carpet warehousing operations to Merchants. However, the recovery of the employees covered by the Warehouse Agreement is limited, pursuant to the court's finding on the issue of reinstatement and back pay, to back pay which had accrued through March 31, 1988.

IT IS SO ORDERED.