HYGRADE OPERATORS, INC., Bushey Towing Co., Inc. and Tanker Ira S. Bushey, Inc., d/b/a Spentonbush/Red Star Companies, Plaintiffs,

v.

LOCAL 333, UNITED MARINE DIVISION, I.L.A., AFL–CIO, Defendant.

No. 90 Civ. 1031 (RPP).

United States District Court, S.D. New York.

Nov. 11, 1990.

Proskauer Rose Goetz & Mendelsohn by Aaron J. Schindel, Marina Lowy, New York City, for plaintiffs.

Vladeck, Waldman, Elias & Engelhard, P.C. by Daniel Engelstein, New York City, for defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs Hygrade Operators, Inc., Bushey Towing Co., Inc. and Tanker Ira S. Bushey, Inc. move for summary judgment pursuant to Fed.R.Civ.P. 56 to vacate, and defendant Local 333, United Marine Division, I.L.A., AFL–CIO (the "Union") cross moves to affirm, an Arbitral Award ("A.A.") dated December 28, 1989, finding plaintiffs had violated the no-lockout provision of a Collective Bargaining Agreement (the "Agreement") and awarding the defendant $50,000 in damages.

At issue is whether the amount of the award has sufficient basis in fact and whether the arbitrator's determination has been explained "in terms that offer even a barely colorable justification for the outcome reached." *Andros Compania Maritima S.A. v. Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir.1978). *See also, New York Typographical Union No. 6 v. Printers League Section of the Ass'n of Graphic Arts*, 878 F.2d 56, 60 (2d Cir.1989).

## BACKGROUND

The arbitral proceeding evolved in the following factual context.

Plaintiffs, who operate collectively under the name Spentonbush/Red Star Companies ("Spentonbush"), are engaged in the business of transporting oil by tug boat and barge. The Union represents Spentonbush's employees, as well as those of other companies in the industry. The Agreement binding Spentonbush and the Union was due to expire at midnight on the Lincoln's Birthday holiday, February 15, 1988. As the expiration date neared, the parties remained far apart in their negotiations which had begun in January 1988 for a new agreement, and a strike was expected by both sides at the Agreement's expiration. The strike vote was scheduled for the afternoon of February 15, 1988.

On Sunday, February 14, 1988, Spentonbush tied up its tugs and barges and dismissed the crews, telling them not to return if there were a strike and to return to work as usual if there were no strike. This action was taken in a departure from past Spentonbush practice.[1] In the past, it had

1. Other departures from past practice also occurred in that certain tugs and barges were tied up in terminals outside New York City, e.g., Newburgh, causing employees unexpected travel problems. Security personnel were employed to make sure employees did leave the

always tied up its boats for the duration of a strike and allowed a few vessels and crews to complete their trips past the strike deadline. This time, however, the Union knew Spentonbush intended to hire replacement employees and had lined up a number of replacements so it could keep operating in the event of a strike. On February 16, 1988, those replacement crews began operating plaintiffs' vessels.[2]

The Union claimed the tying up of vessels and layoff of employees constituted a lockout in violation of Article 1, Section 9 of the Agreement and the parties submitted the issue to arbitration in the following language: "Did the Employer violate Article 1, Section 9 of the Collective Bargaining Agreement by locking out the employees prior to the expiration of the Collective Bargaining Agreement? If so, what shall be the remedy?"

Article 1, Section 9 reads as follows:

**Section 9.  Lockouts**

The Employers agree that during the life of this Agreement, or during any period of negotiations for a new agreement, or for the modification or renewal of this Agreement, there shall be no lockout of the Employees and, upon violation of this provision by the Employers, this Agreement may be terminated by the Union. However, the prohibition against lockouts contained herein shall not be construed to prevent the Employers or any one of them from laying up any vessels, or discontinuing their operation and laying off their crews (Employees), in whole or in part, at any time when for business reasons the Employers deem it advisable to do so.

Arbitration hearings were held on September 7 and 28, 1989. Post-hearing briefs were submitted on November 13, 1989. The arbitrator rendered an Opinion and Award on December 28, 1989 finding Spentonbush did violate the no-lockout provision

of Article 1, Section 9, of the Agreement and ordering Spentonbush to pay the Union $50,000.

## DISCUSSION

■ Spentonbush seeks to have this Court vacate the arbitral award on the grounds that (1) the arbitrator's determination that a lockout occurred is irrational and (2) there was no evidence of damages presented to support his award of $50,000 to the Union. The Union responds that the arbitral determinations in the award are explained in terms that offer more than the requisite "barely colorable justification" as stated in *New York Typographical Union No. 6 v. Printers League Section of the Ass'n of Graphic Arts, supra,* 878 F.2d at 60.

After the hearings and a review of the testimony, A.A. at 1–12, the arbitrator developed his findings in that section of the Opinion and Award entitled "Discussion." A.A. at 12–15. The section opens with the observation that the issue of whether Spentonbush bargained in good faith within the meaning of the National Labor Relations Act ("NLRA") as amended was not the issue before the arbitrator but commences to review the 1988 bargaining positions of Spentonbush, e.g., proposed change of captains from employees to supervisors, openly hiring crew replacements for utilization in the event of a strike, proposed elimination of cooks as positions in the crews. A.A. at 12. It proceeds thereafter to analyze the second sentence of Section 9, which it describes as stating that the prohibition against lockouts shall not be construed to prevent the employer from laying up vessels and laying off crews at any time for business reasons. A.A. at 13. There then follows what appears to be the only "explanation" in the opinion of the arbitrator's finding of a lockout:

vessels and warnings were distributed about refusals to leave peacefully or damages to property. In some cases local police were present.

**2.** Spentonbush did not withhold pay for employees for February 14 or 15, 1988. Instead em-

ployees scheduled to work received full pay for those days, including overtime and holiday pay, and those crews who were dismissed outside New York City were paid the necessary transportation costs.

The Employer argues that when it ordered its employees off the vessels and had police there to escort them, this was not a lockout because a lockout is generally defined as the "temporary withholding of work, by means of shutting down the operation or plant, from a group of workers in order to bring pressure on them to accept the employer's terms." Even accepting this definition for the sake of argument, I conclude that a lockout took place. The employees were about to vote on whether to accept the Employer's proposals or to strike. They knew that striker replacements were waiting to take their jobs if they voted to strike. This is certainly "pressure on them to accept the employer's terms." The fact that the employees were paid does not alter my conclusion that there was a lockout.

A.A. at 13.[3]

One cannot dispute, as the arbitrator concluded, that the open hiring of strike replacements put pressure on employees to accept the employer's terms.[4] But the Opinion and Award does not state why, nor make a finding that, the closing down a day early for the strike vote with no loss of pay put pressure on the employees to accept Spentonbush's terms. This is the sole event alleged to constitute a lockout, according to the Union's own post-hearing brief submitted to the arbitrator. Defendant's Notice of Cross–Motion, Exhibit A, at 6.[5] The Opinion and Award fails both to articulate why, accepting the definition offered by Spentonbush, there was a lockout or to articulate why, under some other definition of lockout, one occurred.

Nevertheless, it is possible the arbitrator is trying to state that Spentonbush's layoff of workers with pay one day early in conjunction with its known hiring of replacement crews constituted pressure on the workers to accept the employer's terms. If so, this is a colorable justification of the arbitrator's finding of a lockout and plaintiff's motion to vacate the award will not be granted on this ground.

After the conclusion that there was a lockout, the Opinion and Award proceeds to examine the second portion of Section 9, pursuant to which Spentonbush claimed secondarily that it was absolved from the prohibition against lockouts. The Opinion and Award states that the three business reasons articulated by Spentonbush for laying up the vessels and laying off the crews were: first, there was almost no work to do since customers had topped off their tanks in anticipation of the strike; second, Spentonbush wanted its barges to be empty when the strike began;[6] and third, the Union knew Spentonbush intended to operate with replacements if a strike occurred and Spentonbush feared for the safety of its property.[7]

The Opinion and Award then agrees that "economic considerations were motivating factors for the actions of the Employer." A.A. at 13. After this statement, it proceeds without explanation to conclude that

---

**3.** The quoted definition of "lockout" is taken from Roberts' Dictionary of Industrial Relations (3d Ed.). The definition reads:

The lockout is the employer's side of the economic pressure when the parties are unable to resolve their problems in negotiations or agree on the terms or conditions of employment. The strike is the union's last resort; the lockout is the employer's. The lockout generally implies the temporary withholding of work, by means of shutting down the operation or plant, from a group of workers in order to bring pressure on them to accept the employer's terms.

*Id. See* Employer's Post–Hearing Brief, Exhibit B to Defendant's Notice of Cross–Motion, at 5–6.

**4.** The open hiring of strike replacements has been held not to constitute an unfair labor practice. *See,* e.g., *N.L.R.B. v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82

L.Ed. 1381 (1938); *Business Services by Manpower Inc. v. N.L.R.B.,* 784 F.2d 442 (2d Cir. 1986).

**5.** Nor does the Opinion and Award state why the existence of potential replacements for work *after* the strike would equate "shutting down the operation or plant."

**6.** Spentonbush wanted the barges empty because of the volatility and flammability of fuel as a cargo and because the cargo was the property of its customers for which Spentonbush did not want to be responsible for any longer than necessary.

**7.** "It heard of threats made by Union officials and it had experienced sabotage on the 'Crusader' [a tug]." A.A. at 13.

the language of Section 9 is "vague and apparently conflicting." *Id.* It then reviews what sort of business reasons would excuse layoffs under Section 9 and apparently questions the first of Spentonbush's justifications on the basis of a conclusion that there was sufficient work to do not to lay up all vessels and lay off all crews, and that this reason given by the employer was not sufficient.[8] A.A. at 13. The Opinion and Award does not address the second business reason offered by Spentonbush, that it wanted to be sure the barges were empty when the strike began.

Next the Opinion and Award addresses fear of vandalism, the third business reason advanced by Spentonbush, and disagrees with the conclusion of Mr. Chelluck, General Manager of Spentonbush, that because an emergency existed, the Agreement's designated tie up places were not secure and that under the Agreement, in such an emergency, they can tie up at another place, "as long as they pay transportation and wages." It concludes that because emergency is a defined term in the Agreement under Article III, Section 1(h), that same definition (high water on the barge canal system or breakdown of a tug) governed when crews may be changed or vessels tied up, and due to that provision, the non-designated places of tie-up of vessels and layoff of crews utilized by Spentonbush violated the Agreement.[9] A.A. at 14.

Lastly, however, the Opinion and Award finds that "the Employer did have business reasons for its actions" and that "the Employer also had negotiating reasons for its actions. It wanted to force the employees to accept its proposals or to replace them." A.A. at 14. Accordingly, the Opinion and Award concludes that since there were "mixed business and non-business reasons" for Spentonbush's action, Spentonbush was not absolved under the second sentence of Section 9 for a violation of the first part of the no-lockout provision. A.A. at 14.

■ The Agreement nowhere says that a business reason must be the only reason for the layoff.[10] This important limitation was added to the Agreement by the arbitrator. An arbitrator may not modify plain and unambiguous provisions of the agreement. *Storer Broadcasting Co. v. American Fed'n of Television and Radio Artists*, 600 F.2d 45, 47 (6th Cir.1979). *See also, Inter–City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184 (8th Cir.1988); *Sears Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154 (6th Cir.1982), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983). In discussing a district court's narrow powers to review an arbitrator's award in a labor dispute, the Supreme Court has noted that "a court should not reject an award on the ground that the arbitrator misread the contract" but "[t]he arbitrator may not ignore the plain language of the contract." *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). Here, the arbitrator ignored the plain language of the Agreement and added a major limitation to an unambiguous provision. Accordingly the motion to vacate the arbitral award will be granted. The arbitrator "inferred limitations ... beyond those contained in the collective bargaining agreement itself." *Sears Roebuck*, 683 F.2d at 155.

■ The Opinion and Award goes on to address the Union's request for relief and rejects an ordered apology and compensatory damages for employees, stating that the most the employees suffered were injured feelings. Then, although it is undisputed that no evidence of damage to the Union was received by the arbitrator, the Opinion

---

8. This reasoning, with which this Court does not take issue, is weakened by the arbitrator's apparent belief that due to past practice of permitting crews to work after a strike deadline, there was an obligation to continue the practice, even though replacements were being used.

9. The Opinion and Award does not challenge that a danger of violence or safety of property and personnel existed.

10. The Agreement says "at any time when for business reasons the Employers deem it advisable to do so."

 

and Award determines that there should be compensation for the Union, rejects the $100,000 requested by the Union to compensate it for "the costs of the strike," but awards $50,000 to the Union to compensate it for the violation of Section 9 of the Agreement by Spentonbush.[11] A.A. at 14–15.

A reviewing court has limited authority to review the amount of an arbitrator's award, but the scope of review includes the authority to decide if the "total award bears a rational relationship to the evidence presented." *Benjamin F. Shaw Co. v. Cincinnati Gas & Electric*, 633 F.Supp. 841, 845 (S.D.Ohio 1986). In this case, the arbitrator was presented with no evidence of damage to the Union, let alone damage caused by the alleged lockout and not by the strike. The award of damages is unsupported by evidence presented. Accordingly, the motion to vacate the award is granted. *Int'l Detroit Coil Co. v. Anthill Ass'n of Machinists & Aerospace Workers*, 594 F.2d 575 (6th Cir.1979), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *Storer Broadcasting*, 600 F.2d 45; *Clemons v. Dean Witter Reynolds, Inc.*, 708 F.Supp. 62 (S.D.N.Y.1989).

## CONCLUSION

In view of the manner in which the Opinion and Award articulates the arbitrator's determinations the Court concludes:

(1) the arbitrator's finding that a lockout occurred approaches the outer limits of "barely colorable justification" but must be allowed to stand;

(2) although the arbitrator did articulate why he could have found the business reasons exception for laying up of vessels did not apply to two of the three reasons offered, he went on to find that in fact Spentonbush did have business reasons for its actions but concluded that the Agreement required that business reasons be the sole reasons for any such conduct. The Agreement nowhere says that a business reason must be the only reason for the layoff. The Court finds that the arbitrator ignored the plain language of Section 9 of the Agreement.

(3) the arbitrator's fixing of compensatory damages for the Union of $50,000 arising out of the alleged violation, without hearing any evidence on the amount of harm or its relationship to the tying up of the boats and layoff of workers is not supported by any facts in the record since no evidence was submitted or received.

The arbitral award is vacated.

IT IS SO ORDERED.

---

11. Local 333's counsel presents with its Notice of Cross Motion for Summary Judgment the affidavit of James Morrissey, Secretary–Treasurer of Local 333, as proof that the arbitrator's award of $50,000 was appropriate because in fact the Union had a basis for claiming $100,000 as damages. This is irrelevant and may not be considered by the Court in this proceeding. The present issue is whether the arbitrator's decision was based on facts in the record then before him, not whether it can be justified by facts presented to this Court several months later.