945 F.2d 18
 138 L.R.R.M. (BNA) 2517, 120 Lab.Cas. P 10,975
 HYGRADE OPERATORS, INC., Bushey Towing Company, Inc., and
Tanker Ira S. Bushey, Inc., doing business as
Spentonbush/Red Star Companies,
Plaintiffs-Appellees,
v.
LOCAL 333, UNITED MARINE DIVISION, ILA, AFL-CIO, Defendant-Appellant.
 No. 1278, Docket 90-9078.
 United States Court of Appeals,
Second Circuit.
 Argued April 11, 1991.
Decided Sept. 3, 1991.
 
 Seymour M. Waldman, New York City (Daniel Engelstein and Valerie Marcus, Vladeck, Waldman, Elias & Engelhard, of counsel), for defendant-appellant.
 Aaron J. Schindel, New York City (Marina O. Lowy, Proskauer Rose Goetz & Mendelsohn, of counsel), for plaintiffs-appellees.
 Before CARDAMONE and MAHONEY, Circuit Judges, and MARTIN,* District Judge.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendant-appellant Local 333, United Marine Division, ILA, AFL-CIO (the "Union") appeals from a judgment of the United States District Court for the Southern District of New York, Robert P. Patterson, Jr., Judge, that granted summary judgment to plaintiffs Hygrade Operators, Inc., Bushey Towing Co., Inc., and Tanker Ira S. Bushey, Inc., d/b/a Spentonbush/Red Star Companies (collectively the "Employer"). See Hygrade Operators, Inc. v. Local 333, United Marine Division, I.L.A., 751 F.Supp. 50 (S.D.N.Y.1990). The summary judgment vacated an arbitration award which (1) determined that the Employer violated a collective bargaining agreement between the Employer and the Union by locking out employees who were members of the Union, and (2) required the Employer to pay the Union $50,000 in damages for the violation.
 
 
 2
 We reverse the judgment of the district court and remand for the entry of judgment confirming the arbitration award.
 
 Background
 
 3
 The Employer, engaged in the business of transporting oil by tugboat and barge, and the Union entered into a collective bargaining agreement effective February 16, 1985 (the "Agreement"). Article I, Section 9 of the Agreement ("Section 9") provides:
 
 
 4
 The Employers agree that during the life of this Agreement, or during any period of negotiations for a new agreement, or for the modification or renewal of this Agreement, there shall be no lockout of the Employees and, upon violation of this provision by the Employers, this Agreement may be terminated by the Union. However, the prohibition against lockouts contained herein shall not be construed to prevent the Employers or any one of them from laying up any vessels, or discontinuing their operation and laying off their crews (Employees), in whole or in part, at any time when for business reasons the Employers deem it advisable to do so.
 
 
 5
 The Agreement provides that "it shall remain in force and effect to and including midnight February 15, 1988." Section 9's prohibition against lockouts, it should be noted, applied not only during the life of the agreement, but also during "any period of negotiations for a new agreement, or for the modification or renewal of this Agreement." In contrast, the otherwise comparable "no strike" provision that constrained the Union, set forth in Article I, Section 8 of the Agreement, applied only during the life of the Agreement.
 
 
 6
 February 14, 1988 was a Sunday, and February 15, 1988 was a holiday under the Agreement. At various times on February 14, representatives of the Employer expelled Union employees from the Employer's tugs and barges, without prior notice, at the various ports at which they were berthed. The Union had a strike vote scheduled on February 15 at 1:00 p.m. According to the arbitrator, "the Parties had been far apart in their negotiations for a new contract and both sides expected the Union to strike at the expiration of the contract." The employees were advised to take their gear, indicating that they would not be allowed to return to the ships if a strike were called. Police accompanied the Employer personnel in some instances. The following notice from the Employer was distributed to many of the employees:
 
 February 13, 1988
 TO: Captain and Crew
 
 7
 FROM: J.P. Gehegan, Jr.
 
 
 8
 The vessel is tieing up here and all of you are requested to gather your gear and leave the ship. You will be paid through Monday including your customary holiday pay.
 
 
 9
 I must caution you that any member of the crew who refuses to leave peacefully or who damages the vessel in any way will be subject to serious criminal penalties. For example, 18 U.S.C. # 2275 provides that anyone who commits any act on a vessel of American registry with intent to injure or endanger the safety of the vessel or persons on board shall be subject to 20 years imprisonment or a fine of $10,000, or both.
 
 
 10
 There are comparable penalties for mutiny or revolt. Any crew member who by force or intimidation usurps command of the vessel from the master, or resists or prevents him in the exercise of his command is guilty of revolt and mutiny under 18 U.S.C. # 2193 and will be subject, upon conviction, to ten years imprisonment.
 
 
 11
 The purpose of this statement is not to threaten you. All that we want is for you to leave the vessel peacefully.
 
 
 12
 As many of you are aware, the Federal Bureau of Investigation is already investigating the numerous threats of violence that have been made. The F.B.I. regards this situation as we do as a serious matter and we expect you to act accordingly.
 
 
 13
 J.P. Gehegan, Jr.
 
 
 14
 The expelled employees were paid for February 14 and 15. The strike vote on February 15 resulted in a strike that commenced on February 16. After taking prior strike votes, as occurred in 1948, 1952, 1957, 1967, 1970, and 1979, the Union personnel had returned to the tugs and barges and worked until the termination of the existing contract or somewhat beyond as necessary to complete a given assignment or delivery. As indicated above, this practice was not followed in 1988, since Union personnel had been required to leave the Employer's tugs and barges, and remove their gear, prior to the strike vote. In addition, the Employer had replacements at hand to replace the Union employees in the event of a strike, contrary to the Employer's prior practice.
 
 
 15
 The Union contended that the Employer had locked out its employees in violation of Section 9. The Union and the Employer submitted this dispute to arbitration pursuant to the Agreement. Article II, Section 3(c) of the Agreement specifies that in the event of arbitration:
 
 
 16
 The decision of the arbitrator shall be final and binding upon the parties hereto, and they agree to abide by such decision. The arbitrator shall have full authority to interpret and apply the provisions of the collective bargaining agreement and to fashion any appropriate remedy. The Employers and the Union shall bear the expense of the arbitration. Such arbitration shall be conducted in accordance with the rules and regulations then prevailing of the American Arbitration Association.
 
 
 17
 The Employer contended that there was no lockout because the ejection of the Union members from the vessels did not exert economic pressure upon them, since they were paid from that time until the expiration of the Agreement. The arbitrator, however, agreed with the Union, reasoning as follows:
 
 
 18
 The Employer argues that when it ordered its employees off the vessels and had police there to escort them, this was not a lockout because a lockout is generally defined as the "temporary withholding of work, by means of shutting down the operation or plant, from a group of workers in order to bring pressure on them to accept the employer's terms."
 
 
 19
 Even accepting this definition for the sake of argument, I conclude that a lockout took place. The employees were about to vote on whether to accept the Employer's proposals or to strike. They knew that striker replacements were waiting to take their jobs if they voted to strike. This is certainly "pressure on them to accept the employer's terms." The fact that the employees were paid does not alter my conclusion that there was a lockout.
 
 
 20
 Alternatively, the Employer contended that its action was permitted by the second sentence of Section 9 because the Employer had valid "business reasons" for the layoff within the meaning of that provision. The asserted business reasons were: (1) there was no work to be done because customers had filled their tanks in anticipation of the strike; (2) the vessels should be empty in the event of a strike because "a barge filled or partially filled with oil or gas is a dangerous instrument;" and (3) the Employer "legitimately and in good faith feared for the safety of its property" because of threats and a prior incident of Union sabotage.
 
 
 21
 The arbitrator agreed that "economic considerations were motivating factors for the actions of the Employer." He also concluded, however, that "the Employer also had negotiating reasons for its actions," i.e. "[i]t wanted to force the employees to accept its proposals [for a new agreement] or to replace them." Viewing the Employer as having "mixed 'business' and 'non-business' reasons" for the layoff, the arbitrator concluded: "When the non-business reasons are considered, there is no absolution for the violation of the first sentence of [Section 9]."
 
 
 22
 The arbitrator then addressed the issue of remedy. As indicated earlier, Article II, Section 3(c) of the Agreement endowed the arbitrator with "full authority ... to fashion any appropriate remedy." The arbitrator declined to require an apology by the Employer or award damages to employees for the "[i]njured feelings" generated by their expulsion from the vessels. On the other hand, the arbitrator required the Employer to pay the Union $50,000, based upon the following rationale:
 
 
 23
 Although no evidence of monetary damages was adduced, there certainly was much expense caused to the Union. How much this amounts to is difficult to determine. The Union's brief states, "To compensate the Union the Employer should pay damages of $100,000. This sum represents only a fraction of the costs of the strike."
 
 
 24
 I believe that an award of $50,000 to the Union is a fair amount to compensate it for the violation of the [Agreement] by the Employer.
 
 
 25
 The Employer then filed a complaint in district court seeking to vacate the arbitration award. After both sides moved for summary judgment, the district court rendered its decision. The court upheld the arbitrator's conclusion that a lockout had occurred, because the arbitrator could reasonably have concluded that "[the Employer's] layoff of workers with pay one day early in conjunction with its known hiring of replacement crews constituted pressure on the workers to accept the employer's terms." 751 F.Supp. at 53. The district court nonetheless vacated the arbitration award, ruling that the second sentence of Section 9 clearly authorized the Employer to lay off its employees as long as the Employer had valid business reasons for doing so, even if it also had negotiating motives for the layoff. Id. at 54. The court reasoned:
 
 
 26
 The Agreement nowhere says that a business reason must be the only reason for the layoff. This important limitation was added to the Agreement by the arbitrator. An arbitrator may not modify plain and unambiguous provisions of the agreement.
 
 
 27
 Id. (footnote omitted).
 
 
 28
 As an alternative ground for vacating the arbitration award, the court ruled that "the arbitrator was presented with no evidence of damage to the Union, let alone damage caused by the alleged lockout and not by the strike. The award of damages is unsupported by the evidence presented." Id. at 55.
 
 This appeal followed.Discussion
 
 29
 Federal jurisdiction in this case is premised upon section 301(a) of the Labor Management Relations (Taft-Hartley) Act, 29 U.S.C. § 185(a) (1988).[1] As was stated in Ethyl Corp. v. United Steelworkers of Am., 768 F.2d 180 (7th Cir.1985), cert. denied, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986):
 
 
 30
 Section 301 of the Taft-Hartley Act does not establish standards for the review of arbitration awards. It does not mention arbitration. It is only because section 301 establishes a federal remedy for breaches of collective bargaining contracts, and because many such contracts (including, of course, the one in this case) contain an arbitration clause, that the refusal to comply with an arbitrator's award becomes a breach of contract upon which a section 301 suit can be founded. But in a famous trio of cases involving the same union as in this case, the Supreme Court made clear that the courts in such cases must give the arbitrator his customary deference; the arbitrator's award is enforceable so long as it "draws its essence from the collective bargaining agreement," even if the court thinks the arbitrator misconstrued the contract. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); see also United Steelworkers v. American Mfg. Co., 363 U.S. 564, 568-69, 80 S.Ct. 1343, 1346-47, 4 L.Ed.2d 1403 (1960).
 
 
 31
 Id. at 184; see also Chicago Typographical Union # 16 v. Chicago Sun-Times, Inc., 935 F.2d 1501, 1503-04 (7th Cir.1991) (suit to vacate labor arbitrator's award is ordinarily a suit to enforce the labor contract that contained the arbitration clause, resulting in jurisdiction under section 301); Davis v. Ohio Barge Line, Inc., 697 F.2d 549, 555 (3d Cir.1983) (suit to set aside arbitration award entered pursuant to collective bargaining agreement falls within federal jurisdiction under section 301 if it alleges that award failed to draw its essence from agreement or arbitrator exceeded his powers thereunder) (citing cases).
 
 
 32
 When an arbitral decision is attacked in such a lawsuit,
 
 
 33
 the "arbitration award will not be vacated ... even if the arbitrator's interpretation of the contract is clearly erroneous ...," Meyers v. Parex, Inc., 689 F.2d 17, 18 (2d Cir.1982) (citation omitted), so long as such award is explained "in terms that offer even a barely colorable justification for the outcome reached." Andros Compania Maritima, S.A. v. Marc Rich & Co., 579 F.2d 691, 704 (2d Cir.1978).
 
 
 34
 In re New York Typographical Union No. 6, 878 F.2d 56, 60 (2d Cir.1989).
 
 
 35
 While an arbitrator "may not shield an ' "outlandish disposition of a grievance" ' from judicial review ' "simply by making the right noises--noises of contract interpretation," ' " Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674, 916 F.2d 63, 65 (2d Cir.1990) (quoting In re Marine Pollution Serv., Inc., 857 F.2d 91, 94 (2d Cir.1988) (quoting Ethyl Corp., 768 F.2d at 187)), "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). Elaborating upon this standard in Misco, the Court stated:
 
 
 36
 Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. Enterprise Wheel, supra, at 599, 80 S.Ct. at 1362. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect.
 
 
 37
 Misco, 484 U.S. at 37-38, 108 S.Ct. at 370-71 (emphasis added).
 
 
 38
 We turn now to the contentions of the Employer and the Union, measuring them against these established standards.
 
 
 39
 The Employer first challenges both the arbitrator and the district court by reasserting the argument that there was no lockout. Based upon its own definition of a lockout (accepted arguendo by the arbitrator) as "the temporary withholding of work, by means of shutting down the operation or plant, from a group of workers in order to bring pressure on them to accept the employer's terms," the Employer contends that there was no "pressure through the withholding of work" because the Union members were paid while laid off pending the termination of the Agreement, and thus "suffered no economic detriment whatsoever."
 
 
 40
 We disagree. The arbitrator could reasonably determine that there was pressure to accept the Employer's terms when, without warning, the employees were forced off the vessels by uniformed security guards. The quoted definition of a lockout does not require that the "pressure" on workers be explicitly financial in nature. Moreover, the layoff exerted financial pressure on the Union and its members, as explained below, by depriving them of their option to continue working under the Agreement (after its expiration) and retaining the right to strike at a time of their choosing. Finally, and in any event, it is clear that the arbitrator arrived at the conclusion that a lockout had occurred by undertaking an analysis of the terms of the Agreement, rather than imposing some view extrinsic thereto, and no more is required to compel judicial affirmance.
 
 
 41
 The Employer also contends that the layoff was justified by the second sentence of Section 9 because it was undertaken for "business reasons" within the meaning of that provision. Specifically, the Employer contends that Section 9 requires resolution of a mixed motive situation in its favor rather than (as the arbitrator decided) the Union's. We are unpersuaded.
 
 
 42
 We agree with the district court that the second sentence of section 9 does not explicitly say that the layoffs it allows must be motivated only by business reasons. On the other hand, it is not an irrational or implausible interpretation of this provision to construe it as implicitly requiring that a layoff be primarily for business reasons to trigger the exemption that it provides. See Ethyl Corp., 768 F.2d at 186 ("contracts have implied as well as express terms, and the authority of an arbitrator to interpret a collective bargaining contract includes the power to discover such terms"). If Section 9 were interpreted to allow layoffs beyond those primarily motivated by business reasons, the employer could prevail by establishing a relatively trivial "business reason" to justify a lockout primarily motivated by a desire to pressure employees. At a minimum, an interpretation of Section 9 that precludes such an outcome clears the low hurdle established by the "barely colorable" standard.
 
 
 43
 Finally, the Employer contends that there was no basis for the arbitrator's award of $50,000 to the Union. We disagree. We first note the broad language of the Agreement, which gave the arbitrator the power "to fashion any appropriate remedy." Second, we note Misco's mandate that courts defer to the "honest judgment" of an authorized arbitrator's determination of a remedy. 484 U.S. at 38, 108 S.Ct. at 370-71. The Court emphasized this ruling even more forcefully later in the Misco opinion, stating:
 
 
 44
 In Enterprise Wheel, for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies." 363 U.S., at 597, 80 S.Ct. at 1361 (emphasis added).
 
 
 45
 Misco, 484 U.S. at 41, 108 S.Ct. at 372 (emphasis added in Misco ). Applying these standards, we conclude that the remedy provided here was within the bounds of the arbitrator's broad discretion.
 
 
 46
 Pointing to the provision in section 9 that bars lockouts "during any period of negotiations for a new agreement," the Union contends that the lockout deprived it of "the ability to strike at the moment most propitious for [its] cause." The Union argues that this option "keep[s] the other side guessing, ... requir[ing] him to expend resources on a state of preparedness that may prove unnecessary or premature." The Supreme Court has recognized that a lockout "deprives the union of exclusive control of the timing and duration of work stoppages calculated to influence the result of collective bargaining negotiations," American Ship Building Co. v. NLRB, 380 U.S. 300, 310, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965), adding: "No doubt a union's bargaining power would be enhanced if it possessed not only the simple right to strike but also the power exclusively to determine when work stoppages should occur." Id.
 
 
 47
 The force of this rationale in the present case is somewhat doubtful. Presumably, the provision in section 9 prohibiting lockouts "during any period of negotiations for a new agreement, or for the modification or renewal of this Agreement," implies that the terms of the Agreement would continue in effect during the negotiation period, as apparently occurred in the past to the extent that Union personnel finished deliveries after the commencement of a strike. As the arbitrator summarized the testimony of the Union president, however, when the six prior strikes occurred, "[t]he practice was that the Union would vote to accept the last proposal or to strike on the last day of the [collective bargaining agreement]," and both sides apparently anticipated a strike vote at the Union meeting on February 15, 1988. Further, the arbitrator's terse treatment of the remedy issue does not indicate whether the damage award was premised upon any Employer deprivation of the Union option to continue to work after February 15, 1988.
 
 
 48
 On the other hand, the Employer had never before prepared for a strike with replacement workers at the ready, and was therefore uniquely vulnerable to extra expense if the Union exercised the option to continue work. Furthermore, the Employer's brief explicitly concedes that the Union had that option.
 
 
 49
 In any event, we need not definitively resolve the tenability of this theory in order to affirm the remedy determined by the arbitrator. Admittedly, the arbitrator stated that "no evidence of monetary damages was adduced," and the district court stressed this point in its reversal of the arbitration award, see 751 F.Supp. at 54-55, as the Employer does on appeal. The arbitrator also stated, however, that "there certainly was much expense caused to the Union." In the nature of the case, no precise quantification of damages was possible. The arbitrator was nonetheless entitled to conclude that the Employer's preemptive lockout weakened the Union's bargaining position both at that juncture of the ongoing labor controversy and in the aftermath, with resultant economic damage to the Union, and to approximate that damage as the circumstances allowed.
 
 
 50
 Although the remedy issue is closer than the liability issue in this case, we conclude that the judicial deference owed to the arbitrator's decision requires confirmation of the arbitration award in all respects.
 
 Conclusion
 
 51
 We reverse the judgment of the district court and remand for entry of judgment confirming the arbitration award.
 
 MARTIN, District Judge, concurring:
 
 52
 I agree with the majority "that the judicial deference owed to the arbitrator's decision requires confirmation of the arbitration award in all respects." I do so, however, solely because the arbitrator's determination "clears the low hurdle established by the 'barely colorable' standard." While I do not agree with all of the conclusions of the arbitrator, I agree totally with the majority's analysis of the limited scope of our review. I would not, however, go beyond holding that the arbitrator's opinion meets those minimum standards and endorse any of the arbitrator's conclusions.
 
 
 
 *
 The Hon. John S. Martin, Jr., United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 29 U.S.C. § 185(a) (1988) provides:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.