ETHYL CORPORATION,
Plaintiff-Appellee,

v.

UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC and Local No. 7441, United Steelworkers of America, AFL–CIO–CLC, Defendants-Appellants.

No. 84–3013.

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1985.

Decided July 22, 1985.

Paul Whitehead, Asst. Gen. Counsel, Pittsburgh, Pa., for plaintiff-appellee.

David L. Swider, Sommer & Barnard, Indianapolis, Ind., for defendants-appellants.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

The steelworkers union appeals from a judgment setting aside a labor arbitrator's award. The appeal requires us once again to consider the scope of judicial review of labor arbitration awards.

In 1980 the union signed a collective bargaining contract with Ethyl Corporation to govern employment at a chemical plant in Indiana. The contract contained a provision that an employee with one or more years' service who had worked 1,040 hours during a calendar year and was "on the payroll of the Company on December 31" of that year would have a "vested right" to a paid vacation the following year. A worker who was "terminated for any reason" before December 31 and was later "reemployed" would become entitled to a full paid vacation upon working 200 hours in the year in which he was reemployed.

On October 15, 1981, the company announced that it would close the plant, which had 33 workers, in mid-November. The company discharged eleven of the workers on October 18, ten in November, and eight on December 4, which was when the plant actually closed; the other four workers had not been working on October 15, because of disability. Although all 33 workers had worked more than 1,040 hours in 1981, the company refused to give vacation pay to 30 of them—the 29 active work-

ers plus a disabled worker whose disability ended on December 22. Only the three who were still disabled on December 31 got vacation pay.

The union filed a grievance on behalf of the 30, asserting that everyone who had been on the payroll when the shutdown was announced on October 15, 1981, was entitled to vacation pay for 1982. Pursuant to the collective bargaining agreement, the dispute was referred to an arbitrator, who on December 22, 1982, issued an award that stated, "The grievance is hereby sustained." In an accompanying opinion the arbitrator explained that although the workers would have had no right to vacation pay in 1982 if they had been laid off before December 31, 1981, because none of them worked 200 hours in 1982 (they worked no hours that year—the plant was closed), the parties had not intended the provision for layoffs to apply to a plant closing. Having (by closing the plant) made it impossible for the workers to earn a paid vacation for 1981 by working 200 hours in 1982, the company could not use the requirement that workers be on the payroll on December 31 to deny them vacation pay. Therefore, "employees who were actively working at the time of the plant closing on December 4, 1981, are entitled to vacation pay for 1982."

Although the collective bargaining contract does not make specific provision for paying workers who are denied their vacation rights in violation of the contract, Ethyl does not dispute that if the company violated the collective bargaining contract the workers are entitled to such pay. However, the arbitrator's award does not specify the amount. If the award is limited to the eight workers who were actually working on December 4, when the plant closed, the amount due would be $15,115.80. If the award includes all 30 workers, it would be $53,887.68. Which amount the arbitrator meant to award is in dispute, as we shall see anon.

At the time of the hearing before the arbitrator, in August 1982, there was some possibility that the plant would reopen. The arbitrator considered the possibility too speculative to figure in his decision. But in May 1983, five months after he issued his award, the plant did reopen and the workers were rehired. Presumably, by working 200 hours in 1983 the workers could earn a paid vacation for 1983 on the basis of their work in 1981—unless the arbitrator's award is sustained and the workers get vacation pay for 1982 based on that work. But the company's position is that the workers had lost all right to a vacation (or pay in lieu thereof) in 1982; since the plant was closed throughout that year, none of the workers worked 200 hours that year to make up for having been off the payroll on December 31, 1981.

The company sued in federal district court, under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, to set aside the arbitrator's award, and the union counterclaimed to enforce it. On cross-motions for summary judgment the district court set aside the award on the ground that "the arbitrator's award did not draw its essence from the agreement. The award is outside the powers conferred on the arbitrator by the terms of the collective bargaining agreement. It imposes upon Ethyl obligations not contained in the agreement and therefore not bargained for by Ethyl."

■ Ever since federal courts began enforcing arbitration awards, the scope of judicial review of the award has been extremely narrow. "Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error either in law or fact. A contrary course would be a substitution of the judgment of the Chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation." *Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349 (1855). To this we add that for judges

to have taken upon themselves to determine the correctness of the arbitrator's award would inevitably have judicialized the arbitration process, in much the same way that judicial review, even of a deferential sort, tends to judicialize the administrative process. The administrative agency must (at least when its proceedings resemble adjudication) find facts like a court, and reason like a court, if it is to withstand correction by the court. And so it would be with arbitrators if their decisions were subject to the kind of review that courts give agencies. Yet the idea of arbitration, as of administrative decision-making but more strongly since there is no counterpart in arbitration to the Administrative Procedure Act, is to provide an alternative to judicial dispute resolution, not an echo of it. If the parties to an arbitration want appellate review of the merits of the arbitrator's decision, they can establish appellate arbitration panels, though they rarely do. But they cannot get such review from the federal courts—which would mean, first from the district court, and then, on appeal, from the court of appeals. This would make arbitration a three-tiered, rather than as in normal adjudication a two-tiered, process; it would make arbitration more judicial than adjudication.

■ Section 301 of the Taft-Hartley Act does not establish standards for the review of arbitration awards. It does not mention arbitration. It is only because section 301 establishes a federal remedy for breaches of collective bargaining contracts, and because many such contracts (including, of course, the one in this case) contain an arbitration clause, that the refusal to comply with an arbitrator's award becomes a breach of contract upon which a section 301 suit can be founded. But in a famous trio of cases involving the same union as in this case, the Supreme Court made clear that the courts in such cases must give the arbitrator his customary deference; the arbitrator's award is enforceable so long as it "draws its essence from the collective bargaining agreement," even if the court thinks the arbitrator misconstrued the contract. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); see also *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568–69, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960).

■ It might in retrospect have been better if the Court had not said "draws its essence from the collective bargaining agreement," arresting as this formulation is (it has displaced all its rivals in the marketplace of judicial formulas), but instead had made the test simply whether the arbitrator had exceeded the powers delegated to him by the parties. That is the test in the federal arbitration statute, see 9 U.S.C. § 10(d), and the Railway Labor Act is quite similar, see 45 U.S.C. § 153 First (q). In meaning if not in words, the test is the same under all three statutes. See, e.g., *Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1276 (11th Cir.1982). The problem with the expression, "draws its essence from the collective bargaining agreement," is that it invites the kind of error that the district judge fell into in this case, of setting aside an arbitration award because the judge is not satisfied that the award has a basis in a particular provision of the contract.

■ Whenever an arbitrator misreads a contract, it is possible to say that his award fails to draw its essence from the contract; that the ground of the award is not the contract but the arbitrator's misreading. But so long as the award is based on the arbitrator's interpretation—unsound though it may be—of the contract, it draws its essence from the contract. See, e.g., *F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union, Local No. 781*, 629 F.2d 1204, 1214–16 (7th Cir.1980); *Manhattan Coffee Co. v. International Brotherhood of Teamsters, Local No. 688*, 743 F.2d 621, 623–24 (8th Cir.1984); *Super Tire Engineering Co. v. Teamsters Local Union No. 676*, 721 F.2d 121, 122–24 (3d Cir.1983)—the last a particularly good example of deference to a highly improbable reading of the collective bargaining agreement by the arbitrator. It is only when the arbitrator *must*

have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference, either, see *Jones Dairy Farm v. Local No. P–1236, United Food Workers,* 760 F.2d 173, 176 (7th Cir.1985)) that the award can be said not to "draw its essence from the collective bargaining agreement," as in our recent decisions in *Young Radiator Co. v. International Union, U.A.W.,* 734 F.2d 321, 325 (7th Cir.1984), and *Miller Brewing Co. v. Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1164–65 (7th Cir.1984). This qualification is made clear, by the way, in the preceding sentence of the *Enterprise Wheel & Car* opinion: "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." 363 U.S. at 597, 80 S.Ct. at 1361.

■ Now often it will be unclear whether the arbitrator has interpreted the contract or relied on some private notion of equity; and though any reasonable doubt must be resolved in favor of enforcing the award, see *id.* at 597–98, 80 S.Ct. at 1361, if the arbitrator here had said or implied that although the workers had not complied with a condition precedent to earning their paid vacations fairness required that they get vacations (or pay in lieu thereof), the district judge would have been right to set aside the award. But that would not be a proper characterization of what the arbitrator did. He applied what is after all a traditional principle of contract law: that you cannot prevent the other party to the contract from fulfilling a condition precedent to your own performance, and then use that failure to justify your nonperformance. See, e.g., Farnsworth, Contracts § 8.6, at p. 566 (1982). If Ethyl had laid off these workers without shutting down the plant, they would have had a chance to earn a paid vacation in 1982. For they might have been recalled in 1982, and if so they would have had to work only 200 hours in 1982 to be entitled to a paid vacation that year. The company eliminated that chance; it must bear the consequence.

The company attacks this reasoning. Not everyone laid off is recalled within a year. If a worker laid off on December 30 was not recalled during the following year, he would have earned no paid vacation for that year even if he had put in 1,040 hours—or for that matter 2,080 hours—in the preceding year. If he died on December 30, his estate would have no right to vacation pay for the next year, again regardless of how many hours he had worked the prior year. The contract is unequivocal in conditioning the right to a paid vacation on the worker's either being on the payroll on December 31 (implying that the plant is open then—there would be no payroll otherwise) or working 200 hours the next year. Moreover, the provision for reemployment (the provision that triggers the 200-hour option), in using the term "re-employed" rather than the more common "reinstated" or "recalled" to describe workers laid off and later reinstated, literally covers a case such as this where the plant is closed and the workers discharged. For if the plant ever reopened, the workers would indeed be reemployed, and not merely reinstated; the employment relationship would have been severed, not, as in a layoff, merely suspended.

Furthermore, while the arbitrator cannot be criticized for having failed to foresee the reopening of the plant 18 months after it was closed, that event provides a basis for the company's argument that all it did when it closed the plant was to lay off these workers temporarily, a contingency for which (the company argues) the contract provides. Thus, on the company's view, the workers had to wait until they had worked 200 hours in 1983 and then they would be entitled to a paid vacation—but in that year, not in 1982, when, being laid off the whole year, they could not earn vacation pay by working 200 hours.

■ But all this just amounts to saying that the arbitrator may have been wrong, maybe even clearly wrong; it does not show that he was doing something other than interpreting the contract. See

*Meyers v. Parex, Inc.*, 689 F.2d 17, 18 (2d Cir.1982). The company, however, challenges the union to point to a provision that grants vacation pay to workers who neither were on the payroll on December 31 nor worked a single hour the following year; and of course there is none. But contracts have implied as well as express terms, and the authority of an arbitrator to interpret a collective bargaining contract includes the power to discover such terms. *Miller Brewing Co. v. Brewery Workers Local Union No. 9, supra*, 739 F.2d at 1163–64. Indeed, "as long as a plausible solution is available within the general framework of the agreement, the arbitrator has the authority to decide what the parties would have agreed on had they foreseen the particular item in dispute.... In such cases, judicial review is limited to whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement." *Desert Palace, Inc. v. Local Joint Executive Bd.*, 679 F.2d 789, 793 (9th Cir. 1982) (citations omitted).

 Inferring an implied condition must be distinguished from creating one, tenuous as the distinction may be as a practical matter. The arbitrator may not modify the contract unless authorized to do so. *Morgan Services, Inc. v. Local 323, Chicago & Central States Joint Bd.*, 724 F.2d 1217, 1222–24 (6th Cir.1984). He was not authorized to do so here; there was an emphatic "no modification" provision in the arbitration clause. But despite contrary intimations in *Sears, Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 156 (6th Cir.1982) (per curiam), there is no rule that an arbitrator, in order to find an implied condition, must first find the language of the contract to be ambiguous. Although a literal reading of the contract in this case would preclude the implied condition that the arbitrator found, he was not obliged to read the contract literally. See, e.g., *International Brotherhood of Electrical Workers, Local Union No. 199 v. United Telephone Co.*, 738 F.2d 1564, 1568 (11th Cir.1984). This is true even though the "no modification" provision expressly confines the arbitrator to the "written provisions" of the collective bargaining agreement. We do not understand this to mean that he could not infer conditions, provided he did so from the written provisions; or that he had to read those provisions literally.

At argument we tested the company's commitment to literal interpretation by asking its counsel whether the arbitrator's award would be defensible if what the company had done was fire these workers on trumped-up charges on December 30 (the plant having remained open), to prevent them from qualifying for a paid vacation in 1982; and he said it would be. When we pointed out that no contract provision says this, he replied that good faith is an implicit provision of every collective bargaining contract, just as it is in contracts governed by the Uniform Commercial Code. See UCC § 1–203. (He might have added that such discharges would violate other provisions of the contract.) Now there is no suggestion that the company acted in bad faith—that it shut down the plant for any reason other than that the plant was unprofitable. But by doing so it prevented the workers from qualifying for a paid vacation by working 200 hours the next year unless it reopened the plant long enough before the end of that year (1982) to allow them to work that length of time— but the plant was not reopened till 1983. The arbitrator thought it contrary to the intent of the parties in adopting the vacation provisions of the contract that the company should be allowed to eliminate otherwise vested vacation rights by closing the plant. He thus found in the contract another implicit commitment by the company, besides a commitment to act in good faith: a commitment to pay for vacations that the workers had earned by working the required number of hours the previous year, in the event the company prevented the workers from satisfying the other condition of their vacation rights (being on the payroll on December 31 of that year) by shutting down the plant. Although this reading of the contract goes beyond merely

implying a condition necessary to prevent bad faith, it *is* a reading of the contract, and not an appeal to sources of duty outside the contract.

 This is not to say that simply by making the right noises—noises of contract interpretation—an arbitrator can shield from judicial correction an outlandish disposition of a grievance. There are cases, such as our *Young Radiator* case cited earlier, where no hypothesis other than that the arbitrator was importing into the dispute his own ideas of industrial justice would be tenable, no matter what he said. But this is not such a case. The doctrine of conditions is sufficiently flexible to make the arbitrator's reading of the contract conventional, at least in method. It may be that in his heart of hearts the arbitrator was actually moved by a sense that the impact of this plant closing on these workers ought in fairness to be buffered by payment of vacation pay (they did, though, receive severance pay). But we cannot peer into his heart, let alone his heart of hearts; and viewed as an interpretation of the contract, the award is not so *outré* that we can infer that it was driven by a desire to do justice beyond the limits of the contract. This is further shown by the fact that when courts have been asked to interpret similar contract provisions, in cases where the parties had not agreed to arbitrate their disputes, they have as often adopted the interpretation of the arbitrator here, see, e.g., *Local Union No. 186, United Packinghouse, Food & Allied Workers v. Armour & Co.*, 446 F.2d 610 (6th Cir. 1971), as the interpretation urged by Ethyl, see, e.g., *Local Lodge 2040, Int'l Ass'n of Machinists v. Servel, Inc.*, 268 F.2d 692, 699 (7th Cir.1959). It is of no moment that one of the cases supporting Ethyl's interpretation is ours; the issue for us in this case is not whether the arbitrator's interpretation of the contract was correct but whether it was a bona fide interpretation of the contract.

 We have gone on at such length because we want to make clear that we take seriously the twin propositions that (1) the reviewing court's function (whether the district court's, or this court's) is at an end when it concludes that what the arbitrator did was interpretation of the contract, and (2) when in doubt the court must find that it was interpretation. We do not want to be plagued by cases in which companies or unions refuse to comply with arbitration awards merely because they think the arbitrator clearly misinterpreted the collective bargaining agreement. If parties to collective bargaining contracts are unhappy with arbitration awards they can bargain for a different method of selecting arbitrators, or for panels of arbitrators, trial or appellate.

 A question remains, however, whether the arbitrator in this case intended all 30 workers to get vacation pay or just the eight that were not terminated before the plant closed. If we thought the question hopelessly difficult we would remand to the arbitrator for clarification of his award. It is true that an arbitrator, unlike a trial court or an administrative agency, is not a tribunal of continuing jurisdiction. When the arbitration is over, the arbitrator is discharged, even if the award has not yet been enforced. But if the award is too ambiguous to be enforced, the court has—it has to have—the power to remand the case to the arbitrator for clarification. It can do this by directing the parties to recall the arbitrator (or appoint a substitute, if the original arbitrator is for some reason unavailable); the parties indicated at argument their willingness to abide by such a procedure. In any event, whatever theoretical difficulties remanding a case to an arbitrator who has lost jurisdiction may cause the fastidious analyst, the number of cases in which such remands have been made, and the common-sense reasons for the procedure in appropriate cases, put the issue beyond debate. See, e.g., *Young Radiator Co. v. International Union, U.A.W., supra*, 734 F.2d at 326; *American Federation of State, County & Municipal Employees, Local Lodge No. 1803 v. Walker County Medical Center, Inc.*, 715 F.2d 1517, 1519 (11th Cir.1983) (per curiam);

188

*McClatchy Newspapers v. Central Valley Typographical Union No. 46, Int'l Typographical Union,* 686 F.2d 731, 734 n. 1 (9th Cir.1982) (dictum).

 But it is a procedure to avoid if possible, given the interest in prompt and final arbitration. Cf. 6 Kheel, Labor Law § 24.05[4] (1984). Concern has been expressed that some companies nowadays are trying to reduce the credibility of unions by dragging out the grievance process through challenges in court to arbitration awards. See *Miller Brewing Co. v. Brewery Workers Local Union No. 9, supra,* 739 F.2d at 1168. Ethyl's success in the district court makes us unwilling to say that its refusal to comply with the arbitrator's award, thereby putting the union to the expense and delay of this suit, was frivolous and should be punished. But we do not want to delay compliance with the award further by remanding the matter to the arbitrator for a clarification likely to provoke a further challenge from the company. We ought if at all possible to resolve the case once and for all now; and we think it is possible.

 The award itself, as distinct from the arbitrator's opinion, a separate document, is unambiguous when tacked together with the grievance. The award says simply that the grievance is sustained, and the grievance was on behalf of all the workers terminated after the announcement of the plant closing—which is to say, all 30 workers, since the announcement was made on October 15, 1981, and the first terminations didn't come till October 18. The ambiguity comes from the statement in the arbitrator's opinion (quoted earlier) that it is the workers who were discharged when the plant closed on December 4 who are entitled to vacation pay; and those are the eight, not the 30. It seems apparent, though, that the arbitrator just made a mistake, and that if we remanded the case for clarification he would say that he meant what the order said.

It is true that labor arbitrators are prone to issue compromise awards not all of which fit a court's idea of what is rational or principled, but we can find nothing in the arbitrator's opinion to suggest that he might have designed a compromise along these lines, especially when Ethyl did not argue for separate treatment of the eight. To confine relief to the employees who happened still to be on the payroll the day the plant closed—to deny relief to the other 22 on the theory that they were laid-off, rather than terminated as a result of a plant closing—would be an inexplicable caprice, as well as being outside the issues defined by the parties. There is no dispute that all the terminations after October 15 were part of the winding down of the plant's operations to zero, a process completed on December 4; they were not layoffs from an ongoing establishment. To distinguish between the workers terminated before the plant closed (but after the announcement) from those terminated when or after it closed would be to invite an employer in Ethyl's position to terminate everyone the day before the plant closed; or if a plant empty of workers must be deemed closed, to terminate all but one the day before the plant closed—and only that one would be entitled to vacation pay. This would be such a weird result that we require something more than an offhand comment in the arbitrator's opinion to make us think he might have intended it—especially when the order itself is unambiguous.

The judgment is reversed with directions to enforce the arbitrator's award of $53,887.68.

Reversed With Directions.