**JASPER CABINET COMPANY,**
Plaintiff–Appellant,

v.

**UNITED STEELWORKERS OF AMER-ICA, AFL–CIO–CLC, UPHOLSTERY and ALLIED DIVISION, and United Steelworkers of America, Local No. 331–U, Defendants–Appellees.**

Nos. 95–2230, 95–2533.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1995.

Decided Feb. 29, 1996.

D. Patton Pelfrey (argued), James Douglas Cockrum, Brown, Todd & Heyburn, Louisville, KY, for Jasper Cabinet Company in No. 95–2230 and 95–2533.

Richard J. Swanson, Macey, Macey & Swanson, Indianapolis, IN, Rudolph L. Milasich, Jeffrey Van Hove (argued), United Steelworkers of America, Assistant General Counsel, Pittsburgh, PA, for United Steelworkers of America, AFL–CIO–CLC, Upholstery and Allied Industries Division and United Steelworkers of America, Local 331–U in No. 95–2230.

Richard J. Swanson, Macey, Macey & Swanson, Indianapolis, IN, Jeffrey Van Hove (argued), United Steelworkers of America, Assistant General Counsel, Pittsburgh, PA, for United Steelworkers of America, AFL–CIO–CLC, Upholstery and Allied Industries Division and United Steelworkers of America, Local 331–U, in No. 95–2533.

Before BAUER, ROVNER, and EVANS, Circuit Judges.

Terence T. EVANS, Circuit Judge.

In this consolidated action, the Jasper Cabinet Company appeals from the district court's entry of summary judgment in favor of the union, the United Steelworkers of America, AFL–CIO–CLC, Upholstery and Allied Industries Division, and its Local No. 331–U. Jasper originally brought separate actions under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to vacate two arbitration awards, both of which found the company in violation of a collective bargaining agreement. The company's primary contention is that the arbitration awards upheld by the district court do not draw their essence from the collective bargaining agreement. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). The company asks us to vacate the district court's enforcement of the awards and, with respect to one, reverse the district court's award of attorney's fees and costs. We decline this invitation and affirm.

We review a district court's decision to grant summary judgment *de novo* and apply the same standard as that employed by the district court. *National Wrecking Co. v. IBT, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 359 (7th Cir.1992). In doing so, "we must review the record and all inferences drawn from it in the light most favorable to the nonmovant . . . and determine whether a genuine issue exists as to any material fact." *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir.1991) (citations omitted). We will affirm a district court's grant of summary judgment where the "pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

As an initial matter, the company contends that the district court erred as a matter of law by granting summary judgment for the union and enforcing the arbitration awards. The facts forming the basis of the parties' dispute are largely uncontroverted. Jasper manufactures hand-crafted furniture, including desks, cabinets, and chairs. The union is the exclusive collective bargaining representative for the employees in the bargaining unit comprised of all production and maintenance employees at the company's plant in Jasper, Indiana.

The record demonstrates that the company and the union are parties to a collective bargaining agreement which was in effect at all times relevant to this action and covers the period of March 2, 1992 to March 1, 1996. The agreement sets forth the wages, hours, and conditions of employment for the employees within the bargaining unit. Article 29 of the agreement provides for a multistep grievance procedure for the resolution of disputes concerning the interpretation or application of the agreement. That article states, in relevant part:

> In the event any employee shall consider that he or she has a grievance under the terms and provisions of this Agreement, or that any provisions of this Agreement have been, or are being violated and any and all differences between the Employer and the Union or any employee of the Employer covered hereunder arising under the provisions of this Agreement shall constitute a grievance, such employee shall process the grievance as follows: ...

Article 29 of the agreement then sets forth a three-step process through which contractual grievances are to be resolved. If grievances cannot be resolved through this process, then Articles 30 through 32 of the agreement establish an arbitration procedure for the final resolution of such disputes. Article 32 states, in relevant part, that:

> The arbitrator may interpret and/or apply any of the terms of this Agreement, but shall have no authority to alter, modify, eliminate, add to or remove any part or parts of this Agreement.

A majority of Jasper's employees do not earn their wages based on an hourly rate. Instead, they work under an incentive wage rate system based upon their volume of production. During the period from May 1990 to August 1993, the company paid bargaining unit employee Robert Leuken at the same incentive rates for performing certain assembly work. In August 1993, the company reduced Leuken's incentive rate, claiming that a change in the work content of his job justified the rate change. The union admits that there had been a change in the work content of Leuken's job, but asserts that the change in work content occurred several years before the company attempted to change the incentive rates.

The union filed a grievance protesting the company's reduction of incentive rates for Leuken, alleging that the change violated the agreement and seeking a return to the prior incentive rates. The parties were unable to settle the grievance prompting its submission to arbitration. After determining that the concept of a "reasonable time limit" applied to the company's right to reduce incentive rates, the arbitrator, Ann Breen–Greco, found that the company violated the agreement when it reduced Leuken's incentive rates. The arbitrator drew this conclusion from a detailed analysis of the plain language of the agreement. The arbitrator sustained the grievance and ordered the company to make Leuken whole for the rate reduction.

Meanwhile, a separate dispute arose concerning the company's assessment of unexcused absences to employees who refused to work overtime hours, and the union filed two grievances objecting to the practice. The two grievances were processed through the contractual grievance procedure and submitted to arbitration. The arbitrator on this dispute, Joseph Cannavo, found the language of the agreement to be ambiguous on the issue of whether Jasper had the right to require employees to work overtime. Looking to other evidence of the parties' intent,

the arbitrator considered the parties' bargaining history and past practice. The arbitrator concluded that overtime was not mandatory under the agreement and the union established that the company had violated the agreement. He sustained the grievances and ordered the company to cease and desist from charging its employees with hours of absenteeism for refusing to work overtime. He also ordered the company to remove all forms of discipline for refusal to work overtime from employees' records.

The company filed separate actions in the United States District Court for the Southern District of Indiana to vacate these two arbitration awards. In each case the union counterclaimed to enforce the awards and cross-motions for summary judgment were filed. On the first arbitration decision and award finding the company violated the agreement by reducing incentive rates, the district court held the arbitrator was properly interpreting the agreement when she found an implied reasonable timeliness condition. Because the arbitrator "was arguably construing or applying the contract and acting within [her] authority," the court granted the union summary judgment and enforced the award.

In the case of the second arbitration decision and award finding overtime not to be mandatory, the district court found that the arbitrator "was applying his informed judgment to the parties' dispute, and rendered a decision which is an arguable application of the Agreement." Finding the company's challenge to this arbitration award to be untenable and meritless, the court awarded attorney's fees and costs to the union.

The company's appeal can be reduced to one issue: whether the arbitration awards draw their essence from the collective bargaining agreement between Jasper and the union. The limited scope of judicial review of arbitration awards is well-settled. *See, e.g., National Wrecking Co. v. Int'l Brotherhood of Teamsters, Local 731,* 990 F.2d 957, 960 (7th Cir.1993); *Polk Bros., Inc. v. Chicago Truck Drivers Union,* 973 F.2d 593, 596 (7th Cir.1992); *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.,* 935 F.2d 1501, 1505 (7th Cir.1991); *United Steel-*

*workers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). As we stated recently in *Sullivan v. Lemoncello,* 36 F.3d 676, 682–83 (7th Cir.1994), the Supreme Court has reiterated this longstanding principle:

> To resolve disputes about the application of a collective bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject the award on the ground that the arbitrator misread the contract. *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). An "arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *Id.* However, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," a court cannot overturn an arbitration award. *Id.*

We will uphold "an arbitrator's award based upon a misreading of the contract so long as the arbitrator's interpretation is derived from the language of the contract." *Polk Bros., Inc.,* 973 F.2d at 597. Although an arbitrator exceeds her authority if her award does not "draw its essence from the collective bargaining agreement," we are hesitant to upset the award on such grounds. *Id.* As we said in *Ethyl Corp. v. United Steelworkers of America,* "[i]t is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract" that the award can be said not to draw its essence from the collective bargaining agreement. *Ethyl Corp.,* 768 F.2d 180, 184–85 (7th Cir. 1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986). Furthermore, "[w]e resolve any reasonable doubt about

whether an award draws its essence from the collective bargaining agreement in favor of enforcing the award." *Polk Bros., Inc.,* 973 F.2d at 597.

■ In sum, as long as an arbitrator's award is based on her interpretation of the contract, a court cannot disturb it. *See, e.g., Enterprise Wheel,* 363 U.S. at 599, 80 S.Ct. at 1362; *Ethyl Corp.,* 768 F.2d at 184. All that is required is that "the arbitrator's interpretation [of the collective bargaining agreement] is derived from the language of" that agreement. *Ethyl Corp.,* 768 F.2d at 185. As will now be demonstrated, each arbitrator's interpretation of the collective bargaining agreement and subsequent award satisfies this standard.

■ In the first case, arbitrator Breen–Greco was asked to resolve the dispute concerning incentive rates. She began her analysis by reviewing the contract articles pertaining to that issue, explaining that "an arbitrator must infer the intent of the contract from its language...." In her view, Articles 48 and 50 of the agreement indicated, as a general matter, an intent "that there must be a reasonableness about time issues." She found that Article 50 contained an explicit time limit which, while not directly applicable to incentive rates, was indicative of a mutual intent concerning time restraints. She found a similar mutual intent in Article 48, which provides that when employees request that their jobs be evaluated for changes which could trigger an increase in incentive pay, the employer "shall make all reasonable effort to make the requested review at the earliest opportunity."

The primary focus of her review was Article 47, which she determined to be the most important contract provision. In Article 47:

> The parties agree that the determination of incentive standards and changes in incentive standards shall be made by the Employer; when there is a change in the work content of the job for which work measurement standards have been established as may be caused by changes in materials, equipment, machinery, methods, layout, or any other reason, whether that change in work content be initiated by the employee or the Employer, then rates shall be changed to correspond to the changes.

Article 47 states "when there *is* a change in the work content ... then [incentive] rates shall be changed to correspond to the changes." Construing this language, she held that the "use of the word 'is' connotes the concept that such change must occur in the present or in a reasonable time." She also noted the lack of "indication in any contract language that either party has the right to accumulate changes over the various negotiating time frames." From her examination of the contract language, she uncovered the concept of a "reasonable time limit." Applying this concept to the fact that the work content (equipment) changes occurred several years before the agreement was renegotiated in 1992, arbitrator Breen–Greco concluded that the company waived its rights to change the incentive standards.

This analysis clearly illustrates that the arbitrator was engaged in interpretation of the contract. Her examination of the contract articles and her reliance on the specific contract word "is" in finding an implicit condition of reasonable time was contract interpretation—plain and simple. As arbitrator of this dispute, Breen–Greco's task was to interpret and apply the terms of the parties' agreement; this is what she did. The fact that she found the concept of a "reasonable time limit" to be implicit in Article 47 does not mean that the award does not draw its essence from the agreement. Indeed, we have held that "contracts have implied as well as express terms, and the authority of an arbitrator to interpret a collective bargaining contract includes the power to discover such terms." *Ethyl Corp.,* 768 F.2d at 186. Our review of the record fails to reveal any evidence which suggests that the arbitrator based her award "on some body of thought, or feeling, or policy, or law that is outside the contract." *Id.,* 768 F.2d at 185. In short, we find that the thrust of the arbitrator's analysis draws its essence from the agreement and falls squarely within her authority to interpret that agreement. The district court's order granting summary judgment to the union to enforce the Breen–Greco award must be affirmed.

Next, we turn our attention to the second arbitration award, where arbitrator Cannavo was asked to resolve the issue of whether Jasper had the right under the agreement to assess absences to employees who refused to work overtime. Because both parties relied on Article 42 to support their positions, the arbitrator began his analysis there. Article 42 provides:

> Employees having the greatest amount of seniority shall be given preference in assignment of extra work, provided they are qualified to perform the duties of the available work; however, overtime work on any regular job shall be performed by that employee regularly on that job. Daily overtime will be performed by the employee assigned to and working on that job when overtime is assigned.

The arbitrator first determined that within the meaning of Article 42 the term "extra work" as used in the first clause of the first sentence of the article is synonymous with the term "overtime" as used in the second clause of the first sentence and the second sentence. Taken together, the sentences send "mixed signals" concerning the issue of whether the company has the right to require employees to work overtime. The arbitrator noted that the union presented unrebutted evidence that the "overtime" language in Article 42, which arguably suggests that overtime is mandatory, was added by the parties in response to a prior arbitration concerning seniority rights in the distribution of overtime work.

The arbitrator found the language of Article 42 to be ambiguous on the issue of whether overtime was mandatory. He then looked to other evidence of the parties' intent. He examined the parties' bargaining history, specifically the last round of contract negotiations, and found that the company's proposals from those negotiations were inconsistent with the company's claim that it had the authority to require employees to work overtime. One of the company's proposals in that round of negotiations sought to establish that if any employee turned down overtime work more than twice during a three month period, that employee would not be selected for overtime for a period of six months. Arbi-

trator Cannavo observed that "this is hardly a proposal from an Employer who claims that it has the right to impose mandatory overtime on its employees." He also noted that during the last round of negotiations, the company proposed, but the union rejected, a contract that would have authorized the company to assess absences to employees who refused to work overtime. This proposal was interpreted by the arbitrator to be a back-door attempt to secure an agreement for mandatory overtime. Finally, the arbitrator found that the subject of mandatory overtime was discussed during the last negotiations wherein the union stated that mandatory overtime would not be in the agreement.

Next, the arbitrator looked to evidence of the parties' past practice and found that the company had consistently acted as though it did not have the authority to order its employees to work overtime. Jasper's plant superintendent testified that the company's method of distributing overtime was to ask the bargaining unit employees, in order of seniority, if they would work overtime. The company also asked the union in 1993 for assistance in encouraging employees to work overtime. In the arbitrator's view, these factors weighed heavily against the company's assertion that it had the right to impose mandatory overtime and instead demonstrated that the company believed that overtime was not mandatory.

In sum, arbitrator Cannavo found that the union established, through "testimony regarding bargaining history; withdrawn Employer proposal[s] from the last negotiations; circumstantial evidence relating to the practices of the Employer which clearly demonstrate its lack of belief that overtime was mandatory; and the lack of contract language itself indicating mandatory overtime," that the contract did not grant the employer the right to discipline employees for refusing to work overtime.

This comprehensive analysis illustrates that the arbitrator was engaged in interpretation of the agreement. He did not ignore the clear and plain meaning of the language of the agreement, as the company contends. Rather, faced with the ambiguous language of Article 42, the arbitrator considered evi-

dence of the surrounding circumstances to determine the parties' intent with respect to mandatory overtime. An arbitrator's award draws its essence from the collective bargaining agreement as long as it is derived from the agreement, "viewed in light of its language, its context, and any other indicia of the parties' intentions...." *Amoco Oil Co. v. Oil, Chemical & Atomic Workers Int'l Union, Local 7-1, Inc.,* 548 F.2d 1288, 1294 (7th Cir.) (citation omitted), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977). In this instance, the focus of the arbitrator's analysis was plainly within his authority to interpret and apply the terms of the agreement. The district court's order granting summary judgment to the union to enforce arbitrator Cannavo's award must be affirmed.

■ The final issue on appeal is the district court's award of attorney's fees and costs to the union which we review for abuse of discretion. The district court found the company's position—that the arbitrator ignored the clear and plain meaning of the language of the contract—to be untenable and meritless, given the broad deference to be given arbitrators in the labor relations field. As set forth above, arbitrator Cannavo examined Article 42, found it to be ambiguous and therefore considered extrinsic evidence of the parties' intent. This can hardly be said to be ignorance of the contract. We, too, find the company's basis for seeking to vacate the arbitrator's award to be meritless. Under these circumstances, we cannot say that the award of attorney's fees and costs was an abuse of discretion.

For the foregoing reasons, the district court's entry of summary judgment enforcing these two arbitration awards and its order that the company pay the union's attorney's fees and costs on the second grievance is AFFIRMED.