**ILLINOIS TOOL WORKS, INC., Plaintiff,**

v.

**COLTEC INDUSTRIES, INC., Textron, Inc., and United Technologies Automotive, Inc., Defendants.**

**No. 98 C 2776.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 15, 1998.

Robin Reed Lunn, Neal, Gerber & Eisenberg, Chicago, IL, John Kenneth Kallman, Law Offices of John Kenneth Kallman, Chicago, IL, for Illinois Tool Works, Inc.

Thomas M. Dee, Scott Kozak, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, MO.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Before us is the plaintiff's motion for an order vacating an arbitration award issued pursuant to the parties' agreement under CERCLA, as well as the defendants' motion to confirm the award and for summary judgment. For the reasons set forth below, we deny the plaintiff's motion to vacate the award and grant the defendants' cross-motion to confirm the award and for summary judgment.

### I. Background

Pursuant to its authority under the Comprehensive Environmental Responsibility, Cleanup and Liability Act of 1980 ("CERCLA"), the United States Environmental Protection Agency ("EPA") designated the Clare Water Supply Site ("the Site") in Clare, Michigan, a Superfund site and placed it on the National Priorities List. The EPA issued an Administrative Order on August 17, 1993, in conjunction with this designation, mandating significant cleanup efforts on the part of

all parties responsible for contamination at the Site. Each of the parties to this action were listed as "potentially responsible parties" and as such were required to develop a plan to pay for the cleanup efforts.

In June of 1994, the plaintiff in this action, Illinois Tool Works, Inc. (ITW), entered into the Clare Water Supply Site Participation Agreement ("the Agreement") with the other potentially responsible parties—Coltec Industries, Inc., Textron, Inc., and United Technologies Automotive, Inc. ("the Coltec Parties" or "defendants"). The Agreement provided for the selection of an independent arbitrator to determine the final allocation of investigation and remediation costs necessary to comply with the Administrative Order.

The parties appointed Stephen D. Anderson to serve as their arbitrator and in this capacity Anderson supervised the parties' discovery of evidence relevant to a final arbitration award. In March, 1997, he held an arbitration hearing in Chicago for the presentation of testimony and documentary evidence. At the end of the hearing, he told the parties that he would distribute his draft report to each of them as soon as possible. He explained that the parties would then have an opportunity to respond, by submitting to him any comments that they may have "on important issues." He continued:

> [I] do not intend that you will introduce new evidence. [I] do not intend that you will use it as an opportunity to reopen the case.
>
> If there are important materials that you want to draw to my attention that are part of the record and that you believe [I] have misinterpreted or not taken into account or things of that nature, and similarly, if there are legal precedents that you think are important that [I] have either misconstrued or not taken into account, [I] welcome that kind of input.
>
> At that point, [I] will look those over, revise the report, if necessary, and distribute a final report. Is that an agreeable procedure?

On May 9, 1997, Anderson issued a 153–page draft report setting forth detailed findings and rulings and a proposed allocation for the Site cleanup costs. The parties submitted their comments on the draft report on June 3, 1997. ITW's comment letter informed Anderson of typographical errors and other minor corrections and stated that it disagreed with some of the arbitrator's discretionary findings and statements. It concluded, however, by stating that ITW "generally concurs that the Arbitrator's findings of fact and his legal analysis support the final allocation of liability as stated in the Report" and that "the final allocation is fair and equitable."

The letter from the Coltec Parties, on the other hand, expressed their concern that Anderson substantially discounted the role of ITW's Weltronic facility in the contamination of the Site based on his belief that there was inadequate data on the extent of the contamination from the Weltronic facility. They claimed that he "failed to adequately evaluate site data and scientific principles and … substituted instead unfounded assumptions and speculation to form the basis of [his] opinion." They alleged that ITW "strenuously resisted efforts to investigate the [Weltronic] property and has been anything but cooperative." Attached to their critique of the draft was a report from Frank Rovers, an expert from Conestoga–Rovers & Associates (CRA), which offered a new scientific model for analyzing the arbitrator's factual findings. The Coltec Parties stressed that they were not offering new data and encouraged Anderson to give ITW "ample time to review and rebut the arguments and conclusions" presented. They also suggested to the arbitrator that

> Unquestionably, additional investigation will substantially expand upon the limited investigation conducted by Conestoga–Rovers [prior to the arbitration hearing] which identified a significant source of contamination on the Weltronic property. We are of the strong opinion that the resulting data will confirm to EPA that Weltronic is the primary source of contamination to the Clare Wellfield.

On June 4, ITW submitted a second comment letter, objecting to parts of the Coltec Parties' submission. ITW argued that the

defendants' submission constituted new evidence and new expert testimony, in violation of Anderson's instructions not to respond to the draft report with new evidence. It claimed that the filing violated the procedure and schedule upon which it believed that both the arbitrator and the parties had agreed, since the deadline for disclosure of experts and submission of expert reports was long past, as was the hearing at which expert testimony was subject to cross-examination. ITW complained that responding to arguments submitted by the Coltec Parties at such a late date would add tremendous expense to what had already been a costly proceeding. ITW therefore requested that Anderson reject Rovers' report and strike any reference to it from the record.

On June 27, Anderson forwarded to the parties his reactions to their comments on the draft report. At the end of his letter, Anderson ordered the parties to "show cause as to whether the Arbitrator should permit or require additional testing" on the Weltronic property, in part because the Coltec Parties alleged that ITW had not cooperated with their efforts to investigate the Weltronic property. He explained that any such testing, if allowed, would have to be "specifically tailored to define with even more precision the exact nature and extent" of the contamination at and from that site.

In response to the Order to Show Cause, the Coltec Parties expressed their support for additional testing. According to the Coltec Parties, Anderson had discretion to "keep open the arbitration to admit new evidence developed from further" testing of the Weltronic property, given the Coltec Parties' justification for their failure to introduce the new evidence earlier and the probative value of the evidence. The Coltec Parties also argued that ITW should bear the cost of the investigation of the Weltronic property.

ITW, however, argued that the Agreement's provision on arbitration does not contain any express or implied authorization for additional discovery or site investigation after the conclusion of the hearing. It claimed that the language of the Agreement dictates that all sampling must be conducted within the discovery period only, that the Coltec

Parties did not raise their motion at an appropriate time, and that no new evidence or data should be admitted. Stating that "[t]he parties expected and are entitled to a final award based on the evidence presented at the hearing," ITW asked the arbitrator to deny the Coltec Parties' motion and issue a final award.

The arbitrator ruled that the Coltec Parties were authorized to perform limited testing and stayed the arbitration for 60 days, pending submission of the test results. In doing so, he did not rely on the Coltec Parties' assertions that ITW impeded their efforts to test the Weltronic property. Rather, Anderson found both that the testing would be useful and necessary to a fair allocation and that ordering such testing was within his authority as arbitrator. He observed that "[t]he excerpts from the Arbitration Agreement with which I have been provided neither expressly allow nor expressly prohibit the performance of additional testing considered important by the Arbitrator to reach an equitable allocation of responsibility of the costs at issue in this proceeding." He noted, however, that the intent of the Agreement was to reach "a result which is both expeditious and just," and explained that because § 9(h) of the Agreement says that "[t]he failure of the Arbitrator(s) to meet deadlines will not affect the validity or enforceability of the award," he inferred that the parties "sought to place a premium on fairness rather than speed in the event of a conflict between these two purposes of the Agreement." He therefore found the agreement to allow him to authorize limited additional testing, "to promote the just allocation of costs in this matter."

The Coltec Parties and ITW then received directions and approval from the EPA for additional testing of the Weltronic Site. CRA conducted the testing on the Coltec Parties' behalf, and ITW monitored it. The Coltec Parties forwarded the additional evidence to Anderson for his consideration. ITW chose not to provide any test results to Anderson.

On January 7, 1998, Anderson issued his final report. In light of the results of the latest testing, he extensively revised his conclusions and allocated more of the overall

costs to ITW. He also allocated the total cost of the additional testing conducted on the Weltronic Property to ITW, the party found responsible for the contamination there.

Three months later, in April, 1998, ITW filed an application to vacate the arbitration award in Cook County Circuit Court. It sought an order vacating the final report and requested that the draft report be declared final and binding. The Coltec Parties removed the case to this Court and filed a counterclaim application to confirm the arbitration award, as well as a motion for summary judgment.

## II. Discussion

Section 10(a) of the Federal Arbitration Act provides that vacation of an arbitration award is warranted where: (1) it was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in one or more of the arbitrators; (3) the arbitrators were guilty of misconduct by which the rights of any party have been prejudiced; or (4) the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award was not made. 9 U.S.C. § 10(a). ITW argues both that the arbitrator exceeded his authority and that he engaged in misconduct that resulted in prejudice to them.

As recently as last month, the Seventh Circuit noted that "[l]itigants attempting to overturn an arbitrator's award face a daunting challenge." *ANR Advance Transp. Co. v. International Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir.1998). That court has repeatedly emphasized that judicial review of arbitration awards is extremely limited, as it "is restricted to determining whether the arbitrator actually interpreted the contract." *Chameleon Dental Products, Inc. v. Jackson*, 925 F.2d 223, 225 (7th Cir.1991). The question

> is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive. By making a contract with an arbitration

> clause the parties agree to be bound by the arbitrators' interpretation of the contract . . . [and they] will not be heard to complain merely because the arbitrators' interpretation is a misinterpretation.

*Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1194–95 (7th Cir.1987) (citations omitted).

The Seventh Circuit has further held that the authority of an arbitrator to interpret a contract includes the power to discover implied terms. *Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 187 (7th Cir.1985). That is, the arbitrator may decide what the parties would have intended with respect to a particular issue not addressed by them, so long as " 'the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement.' " *Id.* at 186 (quoting *Desert Palace, Inc. v. Local Joint Executive Bd.*, 679 F.2d 789, 793 (9th Cir. 1982)). If it can, we must cease our inquiry and confirm the award, even if the arbitrator's interpretation is unsound. *Id.* at 184. We resolve any reasonable doubt in favor of enforcing the award. *Id.*

### A. The Arbitrator's Authorization of Additional Testing at the Weltronic Property

We conclude that Anderson's ruling and subsequent orders were based on his interpretation of the contract. He specifically addressed the parties' opposing arguments and reasoned that:

> [t]he intent of the Arbitration Agreement is to achieve a result which is both expeditious and just. Since the Arbitration Agreement expressly provides (§ 9(h)) that a delay by the Arbitrator in the issuance of the Final Arbitration Report will not invalidate the results of the arbitration, I infer that the parties sought to place a premium on fairness rather than speed in the event of a conflict between these two purposes of the Agreement. Accordingly, I infer that the Agreement permits the Arbitrator to authorize additional testing, within a limited time frame, to promote the just allocation of costs in this matter.

From the language of the agreement Anderson inferred both its general spirit and

the intent of the parties, and he acted accordingly, implying a term which allowed him to authorize post-hearing testing to help him to divide the shared costs equitably, with all of the relevant evidence before him. As we, observed above, we need not agree with his decision to authorize and consider further testing of the Weltronic property. We need only determine that he based his decision on an interpretation of the language of the agreement, and since we have so determined, we cannot say that he acted outside of his authority as an arbitrator. Even though we believe that Anderson's basis for implying his authority to authorize additional testing is debatable, the deferential standard of review requires us to resolve any doubt in his favor. *See Ethyl,* 768 F.2d at 185.

Furthermore, language elsewhere in the Agreement—albeit not expressly referred to by the arbitrator—shows that the conclusion he reached was a plausible one within the general framework of the Agreement. Section 9(c) provides that "[t]he Lead Arbitrator shall oversee the exchange of [discovery] information ... to ensure fairness and equity among the Parties." This provision supports Anderson's interpretation that under the Agreement he was to place a "premium on fairness." Later, § 9(e) states that "[t]he date and schedule for the hearing, and the schedule for pre- or post-hearing briefing shall be fixed by the Lead Arbitrator." This provision supports the inference that the parties contemplated the possibility that some form of post-hearing arguments—although due to the vague language used, we cannot say of what character—would be needed in order for the arbitrator to make a final allocation. In light of these provisions, we find that Anderson's interpretation of the Agreement to permit him to authorize and consider additional testing conducted after the issuance of his draft report "can be rationally derived from some plausible theory of the general framework or intent of the agreement." *Ethyl,* 768 F.2d at 186.

ITW's criticisms of Anderson's conduct seem to stem from the fact that ITW simply interprets the Agreement's language differently than did Anderson. ITW reads the first sentence of § 9(h) of the Agreement, providing that "the arbitrator's failure to meet deadlines will not affect the validity or enforceability of the award," as applying only to the deadline for issuing the award. Anderson, however, implied from this clause that the Agreement favors the extension of deadlines for the purpose of reaching a more equitable allocation over speedy decisionmaking based on possibly incomplete information. ITW also maintains that any action not expressly provided for in the Agreement's procedural provisions exceeds the scope of the arbitrator's authority, while the arbitrator reads more flexibility into the somewhat broad and often ambiguous provisions of the contract. Whether the arbitrator's was the correct reading or not, however, what matters for purposes of our review is that it constitutes an interpretation of the language with which he was presented. That is where our inquiry must end. Even if we disagree with the outcome, we may not overturn an award that the arbitrator made pursuant to his interpretation of the Agreement, as

> [a]rbitration does not provide a system of "junior varsity trial courts" offering the losing party complete and rigorous *de novo* review .... It is a private system of justice offering benefits of reduced delay and expense. A restrictive standard of review is necessary to preserve these benefits and to prevent arbitration from becoming a "preliminary step to judicial resolution."

*Eljer Mfg., Inc. v. Kowin Dev. Corp.,* 14 F.3d 1250, 1254 (7th Cir.1994) (citations omitted).

There is also some dispute in the briefs as to whether or not all of the parties at the hearing agreed to and therefore bound the arbitrator to the schedule he proposed at the end of the hearing, under which the parties were to receive his report in draft form and would then have an opportunity to submit their comments—but not any new evidence—to him in response. In trying to establish that all of the parties agreed to be bound to this particular process, however, ITW points to only one piece of evidence: the transcript of the arbitration hearing. The transcript is precisely where we would expect to see such an agreement reflected, but there is no sign of agreement there. In the absence of such an agreement, Anderson was not bound. to follow that procedure, so his authorization of

what he considered to be necessary additional testing was not improper.

### B. Allocating the Costs of the Additional Testing to ITW

 ITW also argues that Anderson improperly ordered it to pay for the costs of the post-hearing testing conducted by the Coltec Parties. Here again, however, we find that the arbitrator's decision was based on his interpretation of the Agreement's definition of his role and of allocable costs.

As one would expect, since the Agreement did not explicitly authorize post-hearing testing, it does not have a special provision concerning the allocation of the costs of such testing. Two provisions in the Agreement do, however, address the distribution of testing or sampling expenses: § 4(a), which defines "Shared Costs" to include "testing, sampling and analysis," and § 9(c), which governs discovery matters and provides that "any Party may, at its expense, conduct sampling on the property or former property of any other party." ITW takes issue with Anderson's characterization of the testing expenses as "Shared Costs" for whose allocation he was responsible, but does not dispute Anderson's method of allocating "Shared Costs." Anderson's final report shows that he was clearly aware both of the ambiguity of the "Shared Costs" provision and of ITW's claim that the costs of the additional tests should be considered as discovery costs incurred under § 9(c).[1] At the end of his report, he noted that the definition of Shared Costs "lacks a certain amount of precision as to which costs are to be allocated," and in setting forth the final cost allocation Anderson acknowledges ITW's argument and discusses the scope of § 9(c). He rejected this argument, however, reading § 9(c)'s discovery costs provision to cover only "litigation expenses," which he defined to include only the initial testing of the Weltronic facility but not the expenses incurred in response to his Order to Show Cause. The latter, he concluded, were not initial discovery expenses incurred by Coltec in the process of proving a case against another party. Anderson found the expenses to be more appropriately characterized as "necessary cost[s] of response" undertaken "to properly characterize the extent and significance of [the Weltronic] source," and he decided that such expenses fit into the only other possibly appropriate category under the Agreement, that of "Shared Costs," which the arbitration provision charged him with allocating. In reliance on this interpretation of the "Shared Costs," Anderson concluded that the costs incurred in conjunction with the post-hearing testing should be borne by ITW—the party responsible for the contamination—and not the Coltec Parties, who merely proved the existence of the contamination.

We therefore find that Anderson interpreted the Agreement, both regarding his role as the allocator of shared costs under § 9 and regarding the scope of the costs to be shared by the parties under § 4(a). Even if he misconstrued the contract, we cannot say that he "must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference, either . . .)," and for that reason we cannot find that the award does not "draw its essence" from the agreement. *Ethyl Corp.*, 768 F.2d at 184–85.

### III. Conclusion

We deny ITW's motion to vacate the arbitration award and grant the defendants' counterclaim to confirm the award and for summary judgment. It is so ordered.

---

1. ITW argues that under § 9(c), the costs of the additional testing should be borne by the Coltec Parties, since they conducted the testing. It follows that ITW considers the expense to be a discovery expense, since § 9(c) pertains only to discovery matters. This argument seriously undermines ITW's claim that Anderson exceeded his authority by ordering additional testing in the first place, as § 9(c) provides that all of the arbitrator's decisions on discovery issues "shall be final and binding on the parties."